Argued and submitted October 22, 1998, reversed in part; otherwise affirmed February 10, appellant's petition for reconsideration filed February 23 allowed by opinion April 21, 1999
See 160 Or App 19, _____ P2d _____ (1999)

Douglas J. AXEN
and Sandra Axen,
*Respondents,*

*v.*

AMERICAN HOME PRODUCTS CORPORATION
through its pharmaceutical division,
Wyeth-Ayerst Laboratories,
*Appellant,*

STATE OF OREGON
and Wal-Mart Stores, Inc.,
*Defendants.*

(9509-6363; CA A97249)

974 P2d 224

John G. Kester, appearing *pro hac vice*, argued the cause for appellant. With him on the briefs were John W. Vardaman, Robert J. Shaughnessy and Helen I. Dooley of Williams & Connolly, Washington, D.C., and Karen O'Kasey, Margaret Hoffmann and Schwabe, Williamson & Wyatt, P.C.

John Paul Graff argued the cause for respondents Douglas J. Axen and Sandra Axen. With him on the brief were Jeffrey B. Wihtol and Graff & O'Neil.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendant American Home Products Corporation (AHP)[1] appeals from a judgment holding it liable for damages suffered by Douglas Axen. A jury awarded Axen $407,265.75 in economic damages and $1.5 million in noneconomic damages. The jury also awarded Axen's wife, Sandra Axen, $936,392 in damages for loss of consortium. In addition to the compensatory damages, the jury awarded Douglas Axen $20 million in punitive damages.

Because the jury returned a verdict in plaintiffs' favor, we view the evidence and all inferences that reasonably may be drawn from it in the light most favorable to plaintiffs. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). In 1994, Douglas Axen was diagnosed as having a heart condition for which his doctor prescribed amiodarone, a drug manufactured and distributed by AHP under the tradename "Cordarone." The federal Food and Drug Administration (FDA) had approved amiodarone for medical use in 1985, at which time AHP began marketing Cordarone. Beginning in 1986, medical studies were published that linked amiodarone with vision loss and optic neuropathy. AHP was aware of those studies. In August 1994, when Axen began taking Cordarone, the package insert listed "optic neuritis," or optic nerve inflammation, as a rare adverse reaction occurring in fewer than one percent of the patient population, but it did not mention optic neuropathy. Neither the package insert nor any of AHP's promotional material listed permanent vision loss as a possible side effect of amiodarone use, nor did any of AHP's materials recommend regular opthamological examinations while using amiodarone.

At some time in September 1994, Axen began to notice changes in his vision. The changes became more noticeable in late October 1994, and he complained of them to

---

[1] Plaintiffs' original complaint named as defendants AHP, through its pharmaceutical division Wyeth-Ayerst Laboratories, the State of Oregon and Wal-Mart Stores, Inc. The state and Wal-Mart were later dismissed as defendants.

Plaintiffs filed a cross-appeal challenging the State of Oregon's claim to a portion of the punitive damage award. Plaintiffs and the state thereafter filed a joint motion to dismiss the cross-appeal for want of jurisdiction, and we granted the motion.

his cardiologist. His cardiologist referred him to an opthamologist, who examined his eyes and discovered optic nerve swelling and hemorrhaging in each eye. The opthamologist believed that the eye conditions were caused by amiodarone. On November 7, 1994, Axen's cardiologist called Axen and recommended that he stop taking the drug. Although Axen stopped using Cordarone,[2] his vision continued to deteriorate to the point that he became legally blind. Axen eventually was diagnosed as suffering from amiodarone-induced toxic optic neuropathy, which resulted in irreversible degeneration and atrophy of the optic nerve in each eye.

Axen brought this action, claiming, *inter alia*, that AHP had failed to warn that its product could cause permanent vision loss and that that failure to warn was intentional and was done with reckless disregard for the health and well-being of the people using the drug. Sandra Axen joined in the action, claiming economic and noneconomic damages for loss of consortium. The case was tried to a jury, which awarded the Axens a total of $22,843,657.75 in compensatory and punitive damages.[3] AHP appeals from the judgment based on that verdict, claiming that the trial court erred when it (1) allowed admission of overly prejudicial evidence of uncharged misconduct; (2) denied AHP's motion for a directed verdict on plaintiffs' claim that AHP had been negligent in failing to report certain medical studies to the FDA; (3) failed to apply the damages cap required by ORS 18.560;[4] (4) held that Sandra Axen could seek damages for lost earnings as part of her claim for loss of consortium; (5) failed to grant AHP's motion for a preemptory instruction on punitive

---

[2] It is not entirely clear from the record exactly when Axen began to complain of problems with his vision and exactly when he stopped taking Cordarone. However, there is sufficient evidence to support a finding that his vision problems began after he began taking Cordarone.

[3] AHP moved to bifurcate the trial, separating the liability and punitive phases of it. The court denied the motion but bifurcated the jury deliberations. The jury was instructed not to consider punitive damages during its deliberations about liability, and certain exhibits were withheld from the jury until it had determined liability. AHP has not assigned the trial court's refusal to bifurcate the trial as error.

[4] AHP concedes that the assignment of error as to the statutory damage cap is controlled by our decision in *Lakin v. Senco Products, Inc.*, 144 Or App 52, 925 P2d 107 (1996), *rev allowed* 325 Or 438 (1997), and asserts it here only for the purposes of preserving it for Supreme Court review. Accordingly, we do not address it in our decision.

damages; (6) allowed a punitive damage award in a proceeding that failed to comply with due process; and (7) approved a punitive damage award that was unconstitutionally excessive. We affirm in part and reverse in part.

In its first assignment of error, AHP contends that the trial court erred by admitting as evidence two letters from the FDA to AHP and a press release from United States Senator Edward M. Kennedy. The letters and the press release all referred to AHP's marketing of Cordarone and took AHP to task for over-promoting its product.

The FDA letters were admitted for the limited purpose of proving punitive damages. The first letter from the FDA to AHP was dated December 15, 1989. The version submitted to the jury was redacted pursuant to AHP's request and reads, in pertinent part:

"Dear Dr. Canavan:[5]

"Please refer also to your current promotional campaign for Cordarone (amiodarone HCl).

"These promotional campaigns by your firm have presented and continue to present false and/or misleading information regarding the safety and/or efficacy of these products, thereby resulting in misbranding of these products under the Federal Food, Drug and Cosmetic Act.

"Cordarone (amiodarone HCl)

"Cordarone is indicated only for treatment of documented, life-threatening recurrent ventricular arrhythmias (recurrent ventricular fibrillation, recurrent hemodynamically unstable ventricular tachycardia) when these conditions have not responded to documented adequate doses of other available antiarrhythmics or when alternative agents cannot be tolerated. Cordarone is clearly labeled as an antiarrhythmic of last resort.

"The Indications section also makes clear that Cordarone should be administered only by physicians who are expert in the treatment of recurrent life-threatening arrhythmias. The labeling contains an extensive boxed warning that cautions against the use of the drug because of the extreme

---

[5] In 1989, Dr. Bernard Canavan was chairman of the board of Wyeth-Ayerst Laboratories. *See* note 1 above.

risks associated with its use. This extraordinarily cautious labeling accurately reflects the opinion of the medical community that Cordarone is an antiarrhythmic of last resort.

"Prior Warnings Regarding Cordarone Promotion

"Your firm has been warned repeatedly against promoting the drug in a manner inconsistent with this cautionary labeling, with the most recent instance being an extensive telephone discussion between DDAL and two representatives of your firm on February 17, 1989. In that conversation, DDAL advised your firm that the content and emphasis of then-current journal advertisements for Cordarone were fundamentally inconsistent with the content and emphasis of the approved labeling for this product.

"Your representatives suggested that prescribers are already aware of hazards associated with the use of Cordarone, thereby minimizing the need for maintaining this cautionary tone in your promotional activities. DDAL emphasized that certain prescribers may not be familiar with these hazards, and other prescribers might infer from your advertising that Cordarone has been demonstrated to be safer than originally believed. As you know, the labeling for Cordarone has not undergone substantive change since approval, and the agency's original concerns regarding safety of Cordarone have been substantiated.

"Current Promotional Activities

"Review of a current advertisement for Cordarone (3441-3, published in an October, 1989 journal) indicates that our cautions have been ignored by your firm. The advertisement is clearly intended to minimize the hazards of the drug and emphasize the drug's efficacy. Ad number 3441-3 is listed as having been last revised on January 2, 1987.

"This follows your use of brochure number CDR152 (submitted by your firm on May 25, 1989) in which you also minimize hazards associated with the administration of Cordarone, by suggesting that it is possible to administer the drug in a manner that eliminates the need for concern over these hazards.

"Moreover, the primary efficacy claim in this piece is an unapproved use of Cordarone. Your statement that 'an early decision for Cordarone * * * can improve the odds' clearly fails to recognize the drug's unique role as a drug of last resort.

"In brochure number CDR172 (submitted by your firm on August·23, 1989), a single case study is presented which suggests that Cordarone is readily tolerable. At no point in the piece is Cordarone described as a drug of last resort.

"Your firm's ongoing false and misleading promotional activities for Cordarone cause it to be misbranded under sections 502(a), 502(f), 502 (n) and 201(n) of the Federal Food, Drug and Cosmetic Act.

"Conclusion

"Your firm has an intolerable record of compliance with the law, compounded by your recent promotion of Cordarone. * * * Your firm continues to promote Cordarone, an extraordinarily hazardous drug, in a manner we consider clearly misrepresentative of its known hazards.

"We intend to ensure, by all available regulatory means, that your firm complies with the law, and with the widely-accepted scientific principles incorporated therein, so that health care providers and their patients can benefit from promotional information that will further, rather than thwart, their efforts to make informed product selection decisions."

The FDA letter then listed a number of actions that the agency required AHP to take in order to alleviate the perceived defects in its promotional materials and stated that, if AHP failed to provide a satisfactory response, the agency was "prepared to recommend legal action, which may include seizure, injunction, and/or criminal prosecution."

The second FDA letter was received by AHP on February 14, 1992, and reads:

"Dear Mr. Victoria:[6]

"This is in reference to several promotional labeling pieces for Cordarone (amiodarone HCl) identified as CDR:204, CDR:205, and CDR:208 (the 'Risks and Benefits' brochures/pieces); CDR:212 (the 'Clinical Features of Amiodarone-Induced Pulmonary Toxicity' detailer); and CDR:210 (the 'Unmistakably Cordarone: New Tablet-Same Product' slimjim).

---

[6] At the time of the letter, Justin Victoria was an assistant vice president for regulatory affairs at Wyeth-Ayerst Laboratories. *See* note 1 above.

"We regard these pieces to be false and/or misleading within the meaning of § 502(a) of the Federal Food, Drug and Cosmetic Act in that they present an unbalanced view of Cordarone's benefits as opposed to its risks. Our specific concerns are outlined below:

"1. **'Unprecedented antiarrhythmic efficacy;' 'The most effective antiarrhythmic you can prescribe;' 'Unparalleled efficacy.':** These phrases are completely unsubstantiated and thus should not be used. Many of the pieces show bar graphs indicating investigators and the percent 'efficacy' they determined using Cordarone. However, charts such as these are meaningless and misleading unless some time frame is included. Were these patients free of serious arrhythmias for 4 weeks or 2 years? Given that sudden death recurs in 30% of patients after one year (your cited data), 'efficacy' rates of 61% are certainly not 'unparalleled' or 'unprecedented.'

"Moreover, these pieces may mislead a prescriber into considering using Cordarone earlier than its indicated use as a drug of last resort. The presentations in the brochures that present the risks and benefits of 'sudden death' point the reader to the misleading conclusion 'sudden death use Cordarone.' Lastly, this statement should always be prominently highlighted on *all* of your promotional pieces: ' * * * there is no evidence from controlled trials that the use of Cordarone affects survival.'

"2. **The 'Risks and Benefit' presentation:** This entire presentation from brochures CDR:204 and CDR:205 is misleading. Your 'hemodynamic' panels are used as an example. The 'risk' side of the panel usually lists negative consequences. Thus the 'Hemodynamic risk of drug therapy' lists 'exacerbating underlying heart failure * * * decreasing electrical conduction * * * decreasing automaticity * * * provoking AV block' all set against a background of an ECG strip with a ventricular arrhythmia (V-tach). The opposite panel gives the 'Benefit(s) of a unique pharmacological profile.' Listed are: (1) a 'low incidence of CHF aggravation' (Low compared to what? A percent would be much more meaningful); (2) the Cordarone logo at the bottom; (3) but nothing addressing the previously stated risks of AV block, decreased conduction and automaticity (are these truly hemodynamic?). Is the reader to assume by

omission that Cordarone has no AV block or conduction risks as do those other antiarrhythmics? AV block *(e.g.)* is clearly mentioned as an adverse reaction in Cordarone's labeling. This presentation is easily misleading.

"3. **'Low proarrhythmic potential':** Once again, low compared to what? Your detailer should *clearly* and *obviously* state that the risk is 2-5%. A chart (CDR: 204) showing the 'risk of proarrhythmia' with other antiarrhythmic agents excludes amiodarone and quotes 6% as the lowest proarrhythmic incidence rate. Aside from the obvious scientific inaccuracy of comparing incidence data from different trials, is the reader to assume that Cordarone has the lowest proarrhythmic incidence since its 2-5% rate is less than the 6-19% rate for those other antiarrhythmics? I remind you of your labeling (WARNINGS section): '* * * Like other antiarrhythmics, Cordarone can exacerbate the arrhythmia * * * this has occurred in 2 to 5% of patients in various series, and significant heart block or sinus bradycardia has been seen in 2 to 5% * * * Although the frequency of such proarrhythmic events **does not appear greater with Cordarone than with many other agents used in this population, the effects are prolonged when they occur.'** These false and misleading comparisons to other antiarrhythmics should be omitted.

"4. **'Decreased dosage may decrease the incidence of pulmonary toxicity' (use of the Dusman study):** The following comments have been specifically discussed with the FDA's Division of Cardio-Renal Drug Products. The quoting and circulation of the Dusman Study *(Dusman RE, Stanton MS, Miles WM et al. Clinical features of amiodarone-induced pulmonary toxicity.* Circulation. *1990; 82: 51-59)* is a violation of the Act since this data is as yet unconfirmed. There does not appear to be any substantive recent data regarding pulmonary toxicity. Although there has been speculation within the scientific community that a lower dose may cause less pulmonary toxicity, a 1989 workshop sponsored by your firm failed to reach agreement that pulmonary toxicity is either dose or duration-related. Regardless, no specific concrete

information on the dose-relationship to pulmonary toxicity is included in your labeling. Your promotion of this unproven data is in violation of the Act, and all references to the Dusman study should be deleted.

"5. **Selected listing of side effects:** In the back of the 'Risks and Benefits' pieces is a listing of 'Selected adverse reactions.' Included are serious side effects such as 'pulmonary toxicity * * * 2% to 7%; Liver function abnormalities * * * 4% to 9%; proarrhythmia * * * 2% to 5%; hypothyroidism * * * about 2%.' The 'Risks and Benefits' detailer has tabbed sections on 'efficacy,' 'proarrhythmia,' 'hemodynamics,' and 'pulmonary toxicity.' However, the discussion of other serious reactions is relegated to the end of the detailers (in a section without tabs). These adverse reactions are one of the main reasons Cordarone is to be used only as an agent of last resort. It is misleading to provide information on these reactions in an inconspicuous location.

"Additionally, Cordarone has many not-usually-serious yet very bothersome adverse reactions that you do not address but should communicate to the prescriber. These include (quoting from the labeling): 'neurologic problems are extremely common, occurring in 20 to 40% of patients and including malaise and fatigue, tremor and involuntary movement, poor coordination and gait, and peripheral neuropathy...Gastrointestinal complaints, and anorexia, occur in about 25% of patients...Asymptomatic corneal microdeposits are present in virtually all adult patients who have been on the drug more than six months...Dermatological adverse reactions occur in about 15% of patients, with photosensitivity being most common (about 10%).'

"These objections are equally applicable to all other promotional materials featuring these claims.

"Your written response within fifteen (15) working days of receipt of this letter should indicate your firm's intentions with respect to the above observed violations. We request that use of these pieces and other similar or related materials be discontinued immediately."

(Emphasis in original.)

The Kennedy press release was issued on December 12, 1990, and was offered as evidence of liability.[7] The press release contained the text of Senator Kennedy's statement at a hearing before the Senate Labor and Human Resources Committee on the advertising, marketing and promotional practices of the pharmaceutical industry. Senator Kennedy had the following to say about AHP:

"Yesterday the committee heard compelling testimony from a number of witnesses who were critical of a variety of pharmaceutical marketing practices. Some of these practices, such as gifts and symposia, have plagued the relationship between the pharmaceutical industry and the medical profession for many years. Others, such as video news releases, celebrity endorsements, spurious marketing studies and the Physician Computer Network are more recent and more sophisticated.

"We invited Abbott, CIBA-GEIGY, Wyeth-Ayerst and Hoffman-LaRoche to appear at today's hearing to respond to these allegations, but all four companies declined to appear.

. "* * * * *

"Wyeth-Ayerst has a responsibility to explain its Inderal 'frequent flyer' program, its poor record of compliance with FDA's rules on promotion, and its flagrantly abusive campaign for Cordarone. This highly toxic drug is for severe arrhythmias, and is approved only as a drug of last resort for a small number of seriously ill patients. But that means small profits too. So the company expanded its market beyond the approved indications for the drug. It distributed information about how well Cordarone was tolerated based on one individual case history in the company files. It distributed brochures advising doctors to 'make an early

---

[7] Plaintiffs offered the Kennedy press release and two industry newsletters as evidence "establishing notice to the defendant of what defendant knew or should have known at that time about public concerns and government concerns about its compliance with law with respect to the promotion and sale and labeling of its product amiodarone." AHP responded that it understood that those "documents are not limited to punitive damages." The court then informed the jury that the documents were being admitted for the limited purpose of notice but that it was "not a punitive-damage situation." Although the parties and the court later assumed that the press release had been admitted solely as evidence on punitive damages, it was clearly offered and received as evidence of liability. It appears, however, that the jury was not given the press release or the industry publications to examine until it began to deliberate on punitive damages.

decision for Cordarone'—a highly unusual promotional message for a drug of last resort. The FDA issued a warning letter. But the company continued to detail the drug, even to non-specialists, who would have no understanding of the appropriate treatments for the life-threatening condition for which the drug was approved. The company distributed over 16,000 golf balls with Cordarone stamped on them. The company's goal was clearly to promote the drug's use for a large population of patients that could generate higher revenues, to push a product beyond the limits of its scientific data, even if the company is putting patients at risk."

AHP contends that the letters and press release were evidence of uncharged misconduct subject to OEC 404(3)[8] and were inadmissible because their probative value was outweighed by their prejudicial effect.

■ As a preliminary issue, we address plaintiffs' contention that AHP failed to preserve its OEC 404(3) objection to the admission of the press release. At the beginning of the trial, AHP submitted a list of objections to plaintiffs' exhibits. Referring to exhibit 69, the press release, AHP objected solely on the ground that it contained hearsay. When the press release was introduced at trial, AHP again objected on the ground that it was hearsay. At no time before or during trial did AHP *specifically* ask that the press release be excluded under OEC 404(3).[9] On appeal, AHP claims that it did not

---

[8] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[9] At one point in the trial, plaintiffs asked an expert witness whether he was aware that the FDA "had made a finding that Wyeth and [AHP] were falsely and with misleading statements overpromoting amiodarone in the United States[.]" AHP objected, stating "[o]bjection * * * for the same reasons we discussed in chambers." Plaintiffs then asked the witness if he was aware of Senate hearings at which AHP had been accused of overpromoting amiodarone. AHP stated "[s]ame objection, Your Honor, and I'd like to request a limiting instruction." The court then advised the jury that the "last two questions asked, deal with this question of a limited use for punitive damages only, and not for the basic question of liability." Even if that exchange involved an OEC 404(3) objection to evidence about the Kennedy press release, it did not preserve the issue for our review. The press release had earlier been admitted over what was solely a hearsay objection, *see* note 7 above, so any error in overruling a later OEC 404(3) objection to that evidence is necessarily harmless in the absence of a motion to strike the exhibit from the record on OEC 404(3) grounds, which was not made.

need to make a separate OEC 404(3) objection to the press release, because the press release dealt with much the same subject matter as the FDA letters and the court had already ruled that those letters would be admitted for limited purposes. AHP argues that "having received an unambiguous adverse ruling[, it] was not required to engage in the futility of rearguing the same objections when the press release * * * was offered." That contention is not well-taken. Certainly, having received an unambiguous adverse ruling as to the letters, AHP was not required to relitigate its objection *to the letters* in order to preserve its right to challenge that ruling on appeal. *See State v. Cole*, 323 Or 30, 35, 912 P2d 907 (1996) ("Once an evidentiary ruling is made pretrial, the lack of later relitigation of the same issue * * * does not render any claim of error associated with the ruling unpreserved."). That did not relieve AHP of the obligation to object to *other* evidence, even though that evidence may indeed address the same subject matter as the letters. AHP complains on appeal of the "massively prejudicial" effect of the press release, yet it failed to complain properly of such massive prejudice at trial. Because AHP did not raise a proper OEC 404(3) objection to the press release at trial, we will not consider such an objection for the first time on appeal. *See Vancil v. Poulson*, 236 Or 314, 320-21, 388 P2d 444 (1964) ("Appellate courts should not decide new issues upon which the trial court had no opportunity to rule.").

▮ As for the letters from the FDA to AHP regarding the over promotion of Cordarone, we need not determine whether the trial court erred in admitting them because any error is harmless in light of the other properly admitted evidence. The letters from the FDA, one written in 1989 and the other in 1992, accused AHP of "promot[ing] Cordarone, an extraordinarily hazardous drug, in a manner * * * clearly misrepresentative of its known hazards" and "present[ing] an unbalanced view of Cordarone's benefits as opposed to risks." Plaintiffs offered the letters as part of the case for punitive damages, arguing that they were evidence of federal concern about a continuing course of conduct of over promotion and disregard for consumer safety by AHP. The information contained in the letters was repeated in two pharmaceutical trade publications offered by plaintiffs as evidence that AHP

was on notice that its promotion of Cordarone was under scrutiny.[10] Those publications, like the press release, were admitted for purposes of determining AHP's liability for failure to warn. Plaintiffs offered the industry publications as evidence that AHP was on notice that the FDA disapproved of its marketing of Cordarone. Although AHP initially objected to the admission of the industry publications at trial, it has not reasserted that objection here. The FDA letters were not offered as evidence of liability, but AHP complains that the jury could not have helped but consider those letters during its deliberations about liability. Because the industry publications and the press release contained much the same type of information as the letters and were offered as evidence of liability, any consideration that the jury would have given the FDA letters would have been merely cumulative. Evidence that is merely cumulative does not affect a substantial right and is not a proper ground for reversal. *See Powers v. Cheeley*, 307 Or 585, 597, 771 P2d 628 (1989) ("other evidence of like effect diminishes any argument that a substantial right was affected by the [erroneously admitted evidence]").

■ In its second assignment of error, AHP contends that the trial court erred when it allowed plaintiffs to amend their complaint to allege that AHP was negligent in failing to abide by federal regulations that required it to report certain scientific literature to the FDA and when it denied AHP's motion to strike that allegation.[11] AHP argues that the regulations requiring such reporting do not create a private cause of action and that there is no evidence that Douglas Axen's loss of vision was caused by AHP's failure to report. AHP further argues that this issue is controlled by our decision in

---

[10] The trade publications, as well as most of the exhibits that were discussed, submitted and admitted as evidence, apparently were returned to the parties and, hence, are not part of the record on appeal. We rely on the descriptions of those publications as discussed by the parties and the witnesses in the course of trial argument and testimony.

[11] AHP moved for a directed verdict on that specification of negligence, but the proper motion was to strike it. *See, e.g., NW Pac. Indem. v. Junction City Water Dist.*, 296 Or 365, 372 n 1, 677 P2d 671 (1984); *Dept. of Transportation v. DuPree*, 154 Or App 181, 183 n 2, 961 P2d 232, *rev den* 327 Or 621 (1998). Because no one was misled by the improper terminology, we treat AHP's motion as a motion to strike and use that term in our opinion.

*Waddill v. Anchor Hocking, Inc.*, 149 Or App 464, 944 P2d 957 (1997), *rev allowed* 328 Or 40 (1998). We disagree.

At the close of the evidence, plaintiffs moved to amend the pleadings to add, as a further specification of negligence, AHP's failure "to report medical and scientific literature on the association between amiodarone use and loss of vision to the United States Food and Drug Administration." AHP objected, claiming that (1) the regulations did not create a private cause of action; (2) there was no evidence that AHP had violated the regulation; and (3) there was no causal link between any alleged failure to report that literature and Douglas Axen's injuries. The trial court granted the motion to amend and instructed the jury that, if AHP had failed to abide by the regulations, that failure would constitute negligence, unless the jury determined that AHP had acted reasonably under the circumstances.

We conclude that the trial court's rulings correctly embodied the principles set forth in *Gattman v. Favro*, 306 Or 11, 15 n 3, 757 P2d 402 (1988), on the use of governmental rules to establish a standard of care in a negligence action. In that case, the court explained:

> "Strictly speaking, the doctrine of 'negligence *per se*' does not create a cause of action. *Rather, it refers to a standard of care that a law imposes within a cause of action for negligence.* As [the court] stated in *Shahtout v. Emco Garbage Co.*, 298 Or 598, 601, 695 P2d 897 (1985):
>
> > " 'When a plaintiff (or a defendant seeking to prove negligence on plaintiff's part) invokes a governmental rule in support of that theory, *the question is whether the rule, though it was not itself meant to create a civil claim, nevertheless so fixes the legal standard of conduct that there is no question of due care left for a factfinder to determine*; in other words, that noncompliance with the rule is negligence as a matter of law. This court long has held that violations of statutory safety rules by themselves provide the element of negligence with respect to those risks that the rules are meant to prevent, at least unless the violator shows that his conduct in fact did not violate the rule under the circumstances. *Barnum v. Williams*, 264 Or 71, 504 P2d 122 (1972); *Peterson v.*

*Standard Oil Co.*, 55 Or 511, 106 P 337 (1910).' (Footnote omitted)."

(Emphasis added.) In other words, evidence that AHP had violated the regulations would be evidence that AHP had breached a standard of care established by those regulations. If that breach could be shown to have caused Douglas Axen's injuries, then AHP could be liable under a common-law theory of negligence. Thus, AHP's arguments that the regulations do not provide a cause of action are irrelevant, as are its arguments that plaintiffs did not preserve a statutory negligence claim. *Waddill* is inapplicable, because, in that case, the defendant was not under any regulatory or statutory duty to act that could have affected the plaintiff.

Pursuant to 21 CFR sections 314.80 and 314.81, successful applicants for FDA approval to market a new drug are required to make certain reports to the FDA.[12] Under 21 CFR sections 314.80(b) and 314.80(c), AHP was required to review reports in the scientific literature, as well as unpublished scientific papers, for references to adverse drug experiences involving Cordarone and to notify the FDA of those reports. If the adverse experience was serious or unexpected, AHP was required to submit the report to the FDA no later than 15 days after AHP's receipt of the information. 21 CFR § 314.80(c)(1)(I). A "serious adverse drug experience" includes, among others, "a persistent or significant disability." 21 CFR § 314.80(a). An "unexpected adverse drug experience" is an adverse experience not currently listed on the product labeling *or* an adverse experience that may be symptomatically or pathophysiologically related to an event listed in the labeling but of greater severity or specificity. 21 CFR § 314.80(a). We conclude that, under those definitions, post-marketing reports of blindness brought about by amiodarone-induced toxic optic neuropathy would be both serious and unexpected and, therefore, would fall under the reporting requirements of 21 CFR section 314.80. Under 21 CFR section 314.81, AHP was required to submit to the FDA a comprehensive report each year within 60 days of the anniversary date of the approval of AHP's application to market Cordarone. The report was to include, among other things, published clinical

---

[12] AHP does not contend that the FDA regulations do not apply to it.

trials of the drugs, or abstracts of those trials, conducted by or otherwise obtained by AHP.[13]

■ AHP argues that, even if it failed in its obligation to report articles, there is no causal link between that failure and Douglas Axen's injuries. Plaintiffs argue in response that there is sufficient circumstantial evidence to support a jury finding that there was such a link. We agree with plaintiffs. Evidence was presented at trial that the Mayo Clinic article was the only article to document the association between amiodarone use and vision loss, based on an analysis of the case histories of a large number of patients by both cardiologists and neuro-opthamologists. Moreover, evidence was introduced to show that, when the Mayo Clinic article was submitted to the Canadian equivalent of the FDA, that agency required the Canadian distributor of Cordarone to change the product labeling in order to call more attention to the risk of vision loss. The new Canadian label also included a recommendation for regular opthamological examinations designed to detect damage to the optic nerve. Further evidence was submitted to show that the Mansour article was the only pathological study of a human optic nerve that had been subjected to amiodarone-induced toxicity. When viewed in the light most favorable to sustaining the jury's verdict, there is sufficient evidence from which the jury could have concluded that, had the FDA been given the articles, the FDA would have required AHP to change its product labeling, as the Canadian authorities had ordered AHP's Canadian counterpart to do.

 Although Douglas Axen testified that he was not sure whether he would have refused Cordarone treatment if

[13] Plaintiffs identified two articles from the scientific literature that AHP did not submit to the FDA as required, referred to by the parties as "the Mayo Clinic article" and "the Mansour article." The Mayo Clinic article was published in 1987 and described optic neuropathy in a number of patients undergoing amiodarone treatment at the clinic. Eight of those patients suffered vision loss. Although AHP was aware of the Mayo Clinic article, there was no evidence that AHP ever forwarded that article to the FDA. The Mansour article, which was published in 1988, was a single case study in which the authors described the toxic effect of amiodarone on the patient's optic nerve. Because the patient lost his eye to cancer, the doctors were able to perform extensive histopathologic studies on it and to quantify the effect of amiodarone on the patient's optic nerve. There is no evidence that AHP submitted the Mansour article to the FDA. AHP does not argue that it did, indeed, submit the two articles.

he had been warned of the danger of vision loss, he went on to state that, had he been so warned, he would have been much quicker to act when he began having problems with his eyes. A reasonable jury could have concluded that, had the FDA been notified of the Mayo Clinic and Mansour studies and had it required AHP to change its labeling, then Douglas Axen might have discontinued his use of amiodarone before its toxic effect robbed him of his vision. Accordingly, the trial court did not err in denying AHP's motion to strike on that specification of negligence.

■ In its fourth assignment of error,[14] AHP argues that the trial court erred when it allowed the jury to consider Sandra Axen's lost income as part of her claim for loss of consortium.[15] In addition to $500,000 in noneconomic damages, Sandra Axen claimed $436,392 in economic damages resulting from her decision to take early retirement to care for her husband after his injury. Apart from lost income, Sandra Axen did not make any other claim for economic damages. AHP contends that lost income is not damage that is recoverable as part of a claim for loss of consortium. We agree.

> "Loss of consortium has traditionally been thought of in terms of spousal consortium and includes, in addition to material services, elements of companionship, felicity and sexual intercourse. These factors are deemed integral parts of a single conceptual unity, the interference with which is considered the basis for a derivative action by the uninjured spouse for the loss of its benefits."

Terrence F. Kiely, *Modern Tort Liability: Recovery in the '90s* § 8.10, at 407 (1990).

---

[14] AHP's third claim of error addressed the damages cap in ORS 18.560. *See* note 4 above.

[15] Plaintiffs argue that AHP did not preserve the issue of whether forgone earnings may be considered in a claim for loss of consortium. We disagree. When the trial court instructed the jury that it "may consider the amount of loss of income sustained by * * * Mrs. Axen, since the injury to her husband to date, [and] the impairment in future earning capacity that it is reasonably probable that Mrs. Axen will sustain in the future[,]" AHP objected "on the grounds that we raised in our summary judgment [motion], that there's no legal basis for that." In its motion for summary judgment, AHP argued that the economic damages sought by Sandra Axen were not recoverable in a claim for loss of consortium. The economic damages sought by Sandra Axen were for loss of earnings, hence AHP has preserved the issue for appeal.

■ The Oregon Supreme Court has defined consortium as "the common-law right of a [spouse] to the companionship, love and services of the injured spouse," *Elling v. Blake-McFall Co.*, 85 Or 91, 95, 166 P 57 (1917), or "the right to the conjugal fellowship of the [spouse], to [the spouse's] company, cooperation and aid in every conjugal relation." *McKinnon v. Chenowith*, 176 Or 74, 83, 155 P2d 944 (1945). The theory underlying a claim for loss of consortium is that, by virtue of marriage, a spouse receives certain benefits both tangible, as in material services, and intangible, such as companionship and affection, from the other spouse. Accordingly, when one spouse is injured, the uninjured spouse may lose those benefits and is entitled to compensation.

Plaintiffs contend, however, that Sandra Axen's damages should not be limited to the generally accepted elements of consortium but should be expanded to include the income that she lost, in addition to pension benefits, when she retired to take care of her injured husband. Plaintiffs concede that no reported Oregon case has upheld an award of such damages as part of a loss of consortium claim, but they argue that there is no principled reason not to do so. Although we agree with plaintiffs that Sandra Axen has suffered an economic loss by taking early retirement, we are not convinced that that loss is compensable under her claim for loss of consortium.

Plaintiffs cite a number of cases that they claim support their argument, but a closer examination of those cases reveals that, although the courts in those cases may have awarded the uninjured spouse certain economic damages, those damages did not include lost income. *See Ouachita Natl. Bank v. Tosco Corp.*, 686 F2d 1291, *reh'g en banc* 716 F2d 485 (8th Cir 1983); *Bernard v. United States*, 794 F Supp 608 (ED La 1991), *aff'd* 968 F2d 16 (5th Cir 1992); *Poirier v. United States*, 745 F Supp 23 (D Me 1990); *Ossenfort v. Assoc. Milk Producers, Inc.*, 254 NW2d 672 (Minn 1977); *Biddle v. Griffin*, 277 A2d 691 (Del Super Ct 1970). In *Poirier, Ouachita Natl. Bank, Ossenfort,* and *Biddle,* the courts included the fact that the spouse had left work in their analyses of the claims but did not factor lost earnings into the final accountings. At most, the courts determined that a spouse who has left work to care for the injured spouse *may* be entitled to recover the reasonable value of the nursing care he or

she provided. *See, e.g., Ossenfort*, 254 NW2d at 686; *Biddle*, 277 A2d at 692.[16]

■ A careful review of case law in other jurisdictions reveals that the majority of courts have concluded that the only economic damages available to an uninjured spouse as part of a claim for loss of consortium are those damages incurred in replacing the material services and support previously provided by the injured spouse. A few jurisdictions have also included the reasonable cost of care provided to the injured spouse by the uninjured spouse, but the majority have followed the rule that those costs are more properly included in the injured spouse's claim.[17] We need not decide whether Sandra Axen could recover the cost of providing care to her husband, however, because she sought only her lost income. On that claim, we adhere to the traditional rule and hold that lost income is not a proper subject of a damage award for loss of consortium. *See, e.g., Morgan v. Cenac*, 634 So 2d 60, 63 (La App 1994).

■ In its fifth assignment of error, AHP contends that the trial court erred when it denied AHP's motion to strike punitive damages.[18] First, AHP claims that punitive damages should have been stricken because there was no evidence that AHP knew or believed that amiodarone could cause optic neuropathy resulting in vision loss so that any failure to warn of that risk could not, as a matter of law, constitute "wanton disregard" for the safety of others, as *former* ORS 30.925 required for an award of punitive damages.[19]

---

[16] Plaintiffs also rely on *Lester v. Dunn*, 475 F2d 983 (DC Cir 1973). That reliance is misplaced. In *Lester*, the father of an injured child was awarded lost wages after he left work in order to care for the child. That case was decided under a theory of law separate and distinct from the theory of loss of consortium and has no application here.

[17] Some authorities have noted that the rule against allowing an uninjured spouse to recover either lost income or the value of nursing or other services is based on the fact that the injured spouse could recover the cost of such care and that to allow both would allow for double recovery. *See, e.g.*, 1 Prosser and Keeton, *The Law of Torts* § 125, at 933 (5th ed 1988 & Supp); 41 Am Jur 2d, *Husband & Wife*, § 263, at 175-76 (1995).

[18] *See* note 11 above for an explanation of our use of a motion to strike as the proper term for AHP's motion.

[19] ORS 30.925 was amended in 1995. Or Laws 1995, ch 688, § 4. The amendments apply only to actions commenced on or after their effective date, which was September 9, 1995. Or Laws 1995, ch 688, § 5. Plaintiffs commenced this action on September 8, 1995. We therefore refer to the version of the statute that was in effect at that time. That version provided:

AHP did not make that argument to the trial court in its motion but, rather, argued only that its actions were not "wanton," as required by *former* ORS 30.925, because it had warned of optic neuritis and, therefore, had not "completely failed to warn about adverse reactions involving ocular problems." Accordingly, we decline to address whether there was sufficient evidence to show that AHP knew or should have known that amiodarone could cause optic neuropathy resulting in vision loss. *See Vancil,* 236 Or at 320-21.

■ Second, AHP argues, as it did to the trial court, that the fact that it had warned of "optic neuritis" was, as a matter of law, sufficient under *former* ORS 30.925 to shield it from a claim for punitive damages. AHP argues that the record shows "a good-faith attempt to warn physicians of what was known of any association between amiodarone and optic nerve damage[,]" thus precluding a finding of wantonness. Plaintiffs argue in response that the jury could have found that the label warning about "optic neuritis" was *not* a good-faith attempt to warn but, rather, a warning that was so inadequate that it, in itself, constituted a wanton disregard for the safety of others. We agree with plaintiffs.

■ For purposes of determining punitive damages, wanton misconduct is that which creates a substantial risk of harm to another and is purposely performed with an awareness of the risk and a disregard of the consequences. That definition is in keeping with the Oregon Supreme Court's statement that "[p]unitive damages * * * are a penalty for conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others." *Andor v. United Air Lines,* 303 Or 505, 517, 739 P2d 18 (1987).

We conclude that there is sufficient evidence in the record for the jury to have found by clear and convincing evidence that AHP knew of the association between amiodarone

"In a product liability civil action punitive damages shall not be recoverable unless it is proven by clear and c nvincing evidence that the party against whom punitive damages [are] so' ht has shown wanton disregard for the health, safety and welfare of others

ORS 30.925(1) (1993).

use and optic neuropathy; that optic neuritis and optic neuropathy were not interchangeable diagnoses; that optic neuropathy could cause permanent vision loss; and that AHP made a conscious choice not to warn of optic neuropathy. Moreover, there is evidence from which the jury could have concluded that AHP's choice not to warn of optic neuropathy was driven, at least in part, by financial concerns related to its ability to market the product. Hence, there was sufficient evidence to permit the jury to conclude, by clear and convincing evidence, that AHP had acted with extraordinary disregard of or indifference to known or highly probable risks to others. Accordingly, there was sufficient evidence under *former* ORS 30.925 to present the case for punitive damages to the jury.[20]

In its sixth assignment of error, AHP contends that the trial court erred "in allowing an award of punitive damages in a proceeding that failed to comply with due process requirements."[21] Specifically, AHP argues that it was denied due process because (1) the issue of punitive damages was decided by a nonunanimous jury; (2) the court allowed the jury to determine whether AHP had violated federal regulations; (3) AHP was not given notice of the conduct for which it would be punished or the severity of the penalty; (4) AHP was punished for lawful and uncharged conduct; (5) the punitive damages award constitutes an effort by Oregon to impose its regulatory policies on the rest of the country in violation of the Commerce Clause;[22] and (6) the jury's verdict was based on prejudice and passion, inflamed by the Kennedy press release.[23]

---

[20] In its motion, AHP argued that, under *former* ORS 30.927, it was error for the court to submit punitive damages to the jury because there was no evidence that AHP had knowingly withheld information from the FDA in violation of FDA regulations. AHP does not reassert that argument on appeal.

[21] Both AHP's sixth and seventh assignments of error invoke due process rights and, in the case of some arguments, may seem redundant. There is, however, a qualitative difference between the due process argument made in the sixth assignment of error and that made in the seventh. Accordingly, we address the arguments separately, even though it results in some repetition. Additionally, we note that, although AHP originally contended at trial that both the Oregon and federal constitutions were implicated, the only issues raised on appeal are federal constitutional issues.

[22] US Const, Art I, § 8, cl 3.

[23] *See* note 8 above.

■ Initially, we address plaintiffs' contention that AHP failed to preserve any of the above arguments. Plaintiffs contend that AHP cannot rely on any constitutional argument that it did not raise as an affirmative defense and argue that the only such defense raised was that "plaintiffs' claim for punitive damages violates the due process provisions of the United States Constitution and the Constitution of the State of Oregon." Plaintiffs further contend that, because AHP did not specify the manner in which due process was violated or seek a ruling on the defense prior to entry of judgment but, rather, waited until its motion for a new trial, AHP cannot now rely on constitutional grounds for appeal. In the alternative, plaintiffs argue that AHP abandoned its constitutional defense when it informed the court that it would not discuss it in front of the jury. We disagree with those contentions.

AHP has raised a purely legal issue about whether the procedures by which punitive damages were awarded comports with due process. There would be no reason to present that issue to the jury, and it was not a waiver of the defense for AHP to state that it would not mention the defense to the jury. Whether the constitutional issues should have been raised earlier is a closer question, but we conclude that most of the issues were raised in a timely manner sufficient to allow the trial court to consider them, which is the essence of the preservation requirement. *See Stranahan v. Fred Meyer, Inc.*, 153 Or App 442, 466 n 19, 958 P2d 854, *rev allowed* 328 Or 115 (1998) (rationale behind preservation rules is to give parties opportunity to present their positions and trial court opportunity to consider issues). Plaintiffs and the trial court were on notice, by virtue of AHP's twelfth affirmative defense, that AHP contended that an award of punitive damages would deny it due process. In its motion for a new trial, AHP specified the various ways in which due process had been violated during the trial and asked the court for a ruling. We conclude that, for the most part, AHP's constitutional arguments have been preserved sufficiently for our review.

■ We do agree with plaintiffs, however, that AHP has failed to preserve two issues: the decision by a nonunanimous jury and the submission of legal issues to the jury. The proper

time to object to both of those issues was at the time they first arose. Before any issues were submitted to the jury, the court and the parties engaged in an extensive discussion of the nine-juror rule in regard to compensatory and punitive damages, including a fairly complicated discussion about the verdict form. At no time did AHP object to having punitive damages decided by a nonunanimous jury or object to the final version of the verdict form. The same is true as to the issue of having the jury determine the meaning of certain federal regulations. There was extensive testimony by witnesses for both parties, as well as argument to the jury by both parties, about the meaning of those regulations. The trial court instructed the jury that, if it found that AHP had violated the regulations, then it could find that AHP had been negligent, unless it determined that AHP had acted reasonably under the circumstances. AHP did not object to that instruction on the ground that the court was submitting a legal issue to the jury. Accordingly, we conclude that AHP has failed to preserve the above two grounds for appeal.

AHP next argues that the award of punitive damages denied it due process, because it did not have sufficient notice of the conduct for which it could be punished. Specifically, AHP argues that it had no notice that it would be punished for lawful promotional activities that took place outside of Oregon. AHP further contends that it could not have been expected to know that the jury would conclude that it had violated federal regulations. We find those arguments to be without merit. First, under the Due Process Clause, notice of prohibited conduct is satisfied by existing statutory or common law. *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 114, 963 P2d 700 (1998); *see also TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 465-66, 113 S Ct 2711, 125 L Ed 2d 366 (1993). The applicable statutes in this case are ORS 30.925 and 30.927. AHP had notice that, if the jury found (1) that AHP had acted with wanton disregard of the health, safety and welfare of others and (2) that AHP had knowingly withheld from the FDA information that was material and relevant to the injury suffered by Douglas Axen, then the jury could assess punitive damages. Second, AHP was not punished for its promotional activities outside of Oregon—it was punished for failing to warn Douglas Axen's physicians that

amiodarone had been associated with optic neuropathy and vision loss. As a consequence of that failure to warn, Cordarone was prescribed to Douglas Axen in Oregon and was purchased and taken by him in Oregon. Douglas Axen's use of Cordarone ultimately led to his vision loss, again in Oregon. Any information submitted to the jury about AHP's promotional activities was for the purpose of determining the egregiousness of AHP's activities within Oregon, not as further grounds for punishment. Accordingly, AHP had constitutionally adequate notice of the conduct for which punitive damages could be assessed.

 Nevertheless, AHP contends that the punitive damage award violated due process because it punished conduct that was lawful where it occurred and that had no effect on Oregon residents. *See BMW of North America, Inc. v. Gore,* 517 US 559, 572-73, 116 S Ct 1589, 1597, 134 L Ed 2d 809 (1996). In a related argument, AHP contends that the punitive damage award represents an inappropriate attempt by the State of Oregon to impose its regulatory policies on the entire country. We disagree with both contentions. We have determined that the jury could have concluded that AHP had failed to abide by the standard of care set forth in certain federal regulations and that Douglas Axen was injured as a result. That is not like the situation presented in *BMW,* where the plaintiff sought to force BMW to change its disclosure policies nationwide, even though BMW's then-current disclosure policies, although illegal in Alabama, were in keeping with the law in a number of other states. In that case, the United States Supreme Court concluded that punitive damages could be assessed only to the extent that those damages punished conduct that took place in Alabama. *BMW,* 517 US at 572-73.

Here, the jury could have found that AHP had violated a *statutorily established standard of care* and further could have found that those violations led to its failure to warn. That failure to warn directly affected physicians and patients in Oregon, including Douglas Axen. As for AHP's contention that Oregon is barred from punishing it for any failure to abide by the federal regulations, we find nothing in the text of those regulations to indicate that the federal government has chosen *to prevent them from being used to*

establish a standard of care in a common-law negligence action. *See, e.g., English v. General Electric Co.*, 496 US 72, 89, 110 S Ct 2270, 2280, 110 L Ed 2d 65 (1990) ("ordinarily, state causes of action are not preempted solely because they impose liability over and above that authorized by federal law"); *Silkwood v. Kerr-McGee Corp.*, 464 US 238, 255, 104 S Ct 615, 625, 78 L Ed 2d 443 (1984) (traditional principles of state tort law apply with full force unless expressly supplanted by federal regulations); *see also Feldman v. Lederle Laboratories*, 125 NJ 117, 134-38, 592 A2d 1176 (1991), *cert den* 505 US 1219, 112 S Ct 3027, 120 L Ed 2d 898 (1992) (same). AHP has not identified any portion of the applicable regulations or of the legislative history of those regulations that indicate that Congress sought to supplant state tort law remedies when it decided to regulate the drug industry. To paraphrase the court in *Silkwood*, it may be that, to allow a punitive damage award of $20 million based on Oregon negligence law is regulatory in the sense that a drug manufacturer will be threatened with damages liability if it doesn't conform to state standards, but that is something that it appears Congress is quite willing to accept. *Silkwood*, 464 US at 256. Accordingly, we reject AHP's contrary contentions.

Finally, in its seventh assignment of error, AHP contends (1) that it was denied procedural due process when the trial court failed to make express findings as to the factors it considered when approving the jury's punitive damage award and (2) that the $20 million punitive damages award was grossly excessive and, therefore, a violation of substantive due process. We address each contention in turn.

AHP argues that due process requires a trial court to make findings of fact and state its conclusions of law on the record when it evaluated the constitutional validity of a jury's punitive damage award, so as to permit meaningful appellate review of its decision. We disagree. The United States Supreme Court has concluded that a trial court need not articulate its reasons for upholding a punitive damage award, as long as the record indicates that the court gave the parties an adequate hearing and considered their arguments:

"While it is always helpful for trial judges to explain the basis for their rulings as thoroughly as is consistent with

the efficient dispatch of their duties, we certainly are not prepared to characterize the trial judge's failure to articulate the basis for his denial of the motions for judgment notwithstanding the verdict and for remittitur as a constitutional violation."

*TXO*, 509 US at 465. Here, both parties submitted lengthy briefs on their post-verdict arguments, including AHP's due process claims. The court allowed adequate time for oral argument as well, at which both parties concentrated on the court's rulings about evidentiary issues and bifurcation. The court indicated that it had read and considered the parties' briefs, keeping in mind the size of the verdict. Although the court did not refer specifically to AHP's due process claims, the record indicates that the court was mindful of the claims when it made its final rulings on the post-verdict issues. Moreover, because the constitutional issue is purely a legal issue, the trial court's reasoning in support of its decision, while helpful, has no direct bearing on our review. *See Blume*, 155 Or App at 114. Accordingly, we conclude that AHP's procedural due process claim is without merit.

■ Next, AHP argues that the $20 million punitive damages award is unconstitutionally excessive. *See Oberg v. Honda Motor Co.*, 320 Or 544, 555, 888 P2d 8 (1995), *cert den* 517 US 1219, 116 S Ct 1847, 134 L Ed 2d 948 (1996) ("the Due Process Clause of the Fourteenth Amendment imposes a substantive limit on the size of punitive damages awards"). Plaintiffs argue that, under the facts of this case, the award, although large, is within constitutional limits.

■ ■ "Punitive damages may properly be imposed to further a [s]tate's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW*, 517 US at 568. Only when an award can fairly be characterized as *grossly excessive* in relation to the state's interests does it become arbitrary and, hence, violate due process. *Id*. Moreover, a judgment that is a product of a fair proceeding is entitled to a strong presumption of validity. *TXO*, 509 US at 457. We conclude that, given the gravity of AHP's conduct, the extent of the economic and noneconomic damages suffered by plaintiffs and the seriousness with which actions such as those by

AHP are viewed, the jury's award of punitive damages is not unconstitutionally excessive.

We begin the federal excessiveness inquiry by identifying the state interests that the punitive damage award is designed to serve. *Blume*, 155 Or App at 114. In this case, the state has an interest in protecting Oregon residents against harm caused by the failure to give them and their physicians adequate warning of the dangerous side effects of prescription drugs. Moreover, the state has an interest in avoiding the costs of providing health care to patients harmed by mislabeled medications and an additional interest in preventing the loss of productive members of society. Because the potential harm to Oregon consumers is quite high—in this case, Douglas Axen was deprived of his sight—the state's interest in a punitive damage award that will have a significant effect on AHP's behavior is substantial.

Next, we examine the jury's award in light of the guideposts established by the United States Supreme Court in *BMW*. Those are (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm and potential harm suffered and the punitive damage award; and (3) the difference between the award and the penalties authorized or imposed in comparable circumstances. *BMW*, 517 US at 575. Those are not equal factors, nor are they exclusive considerations. They are, however, an effective standard by which to evaluate the propriety of a punitive damage award.

The first factor, the reprehensibility of the defendant's conduct, is generally considered to be the most important, and, therefore, the most heavily weighted. The Court cited three subfactors in *BMW* that it associated with particularly reprehensible conduct: (1) whether the defendant's conduct was violent or threatened violence; (2) whether the defendant acted with trickery or deceit rather than through mere negligence; and (3) whether the defendant has engaged in repeated instances of misconduct. 517 US at 576-77. Although the first subfactor is not applicable to this case, we conclude that an application of the second and third subfactors demonstrates a high degree of reprehensibility on the part of AHP in its conduct toward plaintiffs.

As we have already noted, evidence was presented to the jury that, for a number of years before Douglas Axen's injury, AHP had actual knowledge of the association between amiodarone use and toxic optic neuropathy. Further, there was evidence that AHP knew for the same period of time that there was a qualitative difference between toxic optic neuropathy and toxic optic neuritis yet warned only of optic neuritis. Furthermore, AHP failed to change its labeling even though it continued to receive reports associating amiodarone use with vision loss and even though it was aware that its Canadian counterpart had been required to change its labeling to clarify the danger of vision loss. Finally, AHP had notice that the federal government was concerned with AHP's labeling and advertising practices, particularly with regard to what the government believed to be AHP's minimization of the potential side effects of its product.

Plaintiffs' theory was that AHP made a deliberate choice not to warn that its product might cause vision loss because it feared that such a warning would affect its profits. In other words, AHP deliberately placed misleading information on its packaging in order to preserve sales. Viewed in the light most favorable to plaintiffs, the evidence supports that theory. Our analysis of the first factor, then, supports a conclusion that a high punitive damage award would be appropriate. As the United States Supreme Court has noted, the fact that a defendant has continued to engage in prohibited conduct while knowing or suspecting that it was wrong provides support for the argument that "strong medicine" (so to speak) is required to cure the defendant's disrespect for the law. *BMW*, 517 US at 576-77.

We next consider the relationship between the punitive damage award and the harm caused by AHP's conduct. Most courts, including this court, have at times approached this factor by noting the ratio of compensatory damages to punitive damages and then determining, under the particular facts of the case, whether the ratio is permissible. That approach, while useful, has had the unfortunate effect of causing parties to present, without further analysis, arguments comparing their ratio to that in other, unrelated, cases in order to support their contention that the award is or is not

valid. Accordingly, we find it necessary to repeat the caveat stated in *Stranahan*:

> "[P]unitive damages awards are not evaluated based on a simple formula that compares the ratio of the compensatory damages to * * * the punitive damages. The United States Supreme Court has stated that punitive damages must bear a 'reasonable relationship' to compensatory damages. The Court also has indicated that there should be a 'reasonable relationship' between the punitive damages award and the harm that is likely to result from a defendant's conduct, as well as the harm that actually resulted. Thus, a punitive damage award 20 times the compensatory damage award might be proper in one case, but a punitive damages award twice the compensatory damages award might be excessive in another case."

153 Or App at 466-67 (citations omitted). In addition, a higher ratio may be appropriate where the monetary value of the noneconomic harm is difficult to determine. *Id.* at 467.

 Douglas Axen was awarded $1,907,265.75 in compensatory damages. That included economic damages of $407,265.75 and noneconomic damages of $1.5 million. Sandra Axen, in turn, was awarded $500,000 in noneconomic damages that we have upheld on appeal. Those compensatory damages at first might seem to be sufficiently large to deter AHP from further misconduct, so as to make a $20 million punitive damage award excessive, but other considerations support a large punitive damages award.[24] Unlike the plaintiff in *BMW*, who suffered only minor economic damage,[25] Douglas Axen lost the use of a vital sense. Although the

---

[24] In *BMW*, the United States Supreme Court stated that, in some circumstances, low compensatory damages might support a higher ratio of punitive damages than would high compensatory damages, presumably on the ground that a high compensatory damage award would have a significant deterrent effect, making a high punitive damage award less necessary to deter misconduct. We conclude, however, that, in other cases, high compensatory damages may themselves be evidence of the egregiousness of the defendant's conduct and might, therefore, support a high ratio as well.

[25] In *BMW*, the plaintiff had discovered that the car that he had purchased had been repainted before he purchased it and as a result had lost value. The jury found that the plaintiff had suffered economic damages of $4,000 and no noneconomic damages. The United States Supreme Court determined that, under those circumstances, a punitive damages award of $2 million was excessive, particularly in light of the fact that there was no evidence that the plaintiff or any other consumer was threatened with any additional potential harm by BMW's policy of not disclosing minor repairs made before purchase.

jury awarded a significant sum in noneconomic damages, it is difficult to determine what sum would be adequate to make up for the loss of one's sight. Furthermore, unlike *BMW*, the potential that other consumers might suffer the harm suffered by Douglas Axen if AHP does not change its practices supports a large punitive damage award. Even if it is true, as AHP contends, that amiodarone-induced toxic optic neuropathy is rare, its consequences can be catastrophic. The State of Oregon has a strong interest in protecting its residents against such a catastrophe. And finally, although a defendant's ability to pay a large punitive damages award is not conclusive of the award's validity, *see, e.g., Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 281, 965 P2d 440 (1998), it is appropriate to consider whether an award is of an amount sufficient to cause the defendant to change its practices. There is evidence that AHP's annual profits are such that a smaller award may simply be absorbed as a cost of doing business. Hence, we conclude that the fact that the punitive damage award is approximately eight times plaintiffs' compensatory damages is not, in itself, unconstitutional.[26]

The third factor discussed by the Supreme Court in *BMW* was the comparison between the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. That factor recognizes the deference that a reviewing court should accord legislative judgments about appropriate penalties for the conduct at issue. *BMW*, 517 US at 583. AHP contends that the maximum penalty to which it was exposed for its conduct toward plaintiffs was approximately $60,000 in fines, significantly less than the punitive damages awarded by the jury. Plaintiffs argue in response that we should consider the fact that federal regulations allow the FDA to seize misbranded drugs

---

[26] Although punitive damages were sought and awarded to Douglas Axen alone, the harm caused by AHP's conduct includes the $500,000 in noneconomic damages suffered by Sandra Axen for loss of consortium. Hence, Sandra Axen's damages should be included in the calculation of the ratio between compensatory and punitive damages in the case. Even if we err in including Sandra Axen's damages in the calculation, the ratio of punitive damages to Douglas Axen's compensatory damages is approximately 10.5 to 1, which also does not violate the Due Process Clause under the facts of this case.

and to enjoin manufacturers from distributing or selling misbranded drugs in evaluating the potential financial consequences to AHP of its misconduct.

■ Although AHP is correct that, under Oregon law, the possible criminal and administrative penalties that AHP could face for its conduct might not themselves be sufficiently large to give it notice that a severe economic penalty could be imposed for that conduct, we disagree with its contention that we should not consider the effects of an injunction on the sale of Cordarone because the State of Oregon has no authority to impose such a sanction. In *BMW*, the court examined the laws of various jurisdictions to determine whether the defendant had adequate notice that it might be subject to a multimillion dollar penalty. 517 US at 584. Because the manufacture, distribution and marketing of prescription drugs are subject to federal regulation, it is appropriate to refer to possible federal sanctions. While it is true that the State of Oregon does not have the power to impose those sanctions, their existence nevertheless indicates the seriousness with which conduct such as that in which AHP engaged is viewed by the federal government and the severity with which that conduct can be punished. Although we can only speculate as to the effect on AHP of a seizure of Cordarone or an injunction against its sale, there is evidence that AHP would suffer large economic losses from such an action. However, because there is a degree of uncertainty about that potential loss, we conclude that application of the third factor weighs neither for nor against the jury's award.[27] Nevertheless, as we stated above, the various factors that bear on the constitutionality of a punitive damage award are not equal. We have already determined that the first and second factors strongly support a conclusion that the jury's award is constitutional. The fact

---

[27] Because of our resolution of this issue, we need not decide how ORS 30.925 affects the evaluation of the third *BMW* factor. We note, however, that ORS 30.925 arguably gives sellers of products notice that Oregon juries are authorized to award punitive damages under the criteria established by the statute, which criteria do not require juries to correlate their awards with potential criminal and administrative penalties. Further, the statute represents a legislative endorsement of punitive damages, as long as those damages are awarded in accordance with the relevant statutes. That legislative endorsement arguably undercuts the significance of the third *BMW* factor, which is premised on deference toward legislative judgment about the appropriate level of punishment to be imposed for the conduct on which the award is based.

that our consideration of the third factor is inconclusive does not change that conclusion. Under the totality of the circumstances, taking into account the historical validity of punitive damage awards designed to protect state interests and the gravity of the injury done in this case, we conclude that the punitive damage award of $20 million is not unconstitutionally excessive.[28]

Reversed as to Sandra Axen's claim for economic damages for loss of consortium; otherwise affirmed.

---

[28] In a related argument, AHP contends that the punitive damage award violates the excessive fines prohibition of the Eighth Amendment to the United States Constitution. We conclude that, in the case of a civil award of punitive damages, the excessive fines analysis is subsumed by the due process analysis dictated by the court in *BMW*. Because we have concluded that the award here does not violate due process, we need not separately address whether the award imposes an excessive fine.