For these reasons, defendants are entitled to summary judgment. An appropriate order is issued herewith.

### ORDER

In accordance with the Memorandum filed herewith,

**IT IS HEREBY ORDERED** that the motion of defendants for summary judgment (Doc. No. 23) is sustained. The action is dismissed with prejudice. Any other pending motions are denied as moot.

**Roger G. NELSON, and Lou Nelson Plaintiffs,**

v.

**AMERICAN HOME PRODUCTS CORPORATION, and Wyeth–Ayerst Laboratories Company, Defendants.**

No. 98–0909–CV–W–01.

United States District Court,
W.D. Missouri,
Western Division.

March 24, 2000.

Grant L. Davis, Thomas C. Jones, Scott S. Bethune, and Timothy L. Brake, Law Offices of Lantz Welch, P.C., Kansas City, MO, for plaintiffs.

Harvey L. Kaplan, Mark C. Hegarty, Steven M. Thomas, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for defendants.

## ORDER

WHIPPLE, District Judge.

Rodger Nelson ("Nelson") lost his eyesight while he was taking Cordarone, a prescription heart medication manufactured and sold by American Home Products Corporation and Wyeth–Ayerst Laboratories Company (collectively referred to as "Defendants"). This products liability lawsuit followed.

To recover damages from Defendants, Plaintiffs Rodger and Lou Nelson ("the Nelsons") must prove, among other things, that Defendants' drug caused Nelson's lost eyesight. Defendants have moved for summary judgment on grounds that the Nelsons have failed to generate any issues of material fact that would permit a reasonable inference in their favor on the issue of causation. Specifically, Defendants argue that the Nelsons have failed to produce any admissible evidence that would entitle a reasonable trier of fact to infer that Defendants' drug caused Nelson's lost eyesight. Based on the Court's review of the extensive record submitted by counsel for both parties, and for the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). The facts and inferences from those facts are viewed in the light most favorable to the nonmoving party. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 586–90, 106 S.Ct. 1348, 1355–58, 89 L.Ed.2d 538 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *Id.* The applicable substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11.

When the nonmovant has the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2554. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Id.; Lujan v. National Wildlife Federation,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e); *Lower Brule Sioux Tribe v. State of S.D.,* 104 F.3d 1017, 1021 (8th Cir.1997). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323 106 S.Ct. at 2552. Thus, summary judgment is appropriate in cases where the party bearing the burden of proof at trial has not presented any admissible evidence on an essential element of his or her claim. *See e.g. Sorensen v. Shaklee Corp.,* 31 F.3d 638, 650–51 (8th Cir.1994) (affirming summary judgment where plaintiff's only causation evidence was held inadmissible under Rule 702).

## II. FACTUAL BACKGROUND

After Nelson suffered a cardiac arrest on March 10, 1996, his cardiologist, Dr. Demosthenis Klonis, D.O., prescribed Cordarone, which is also known by its generic name, Amiodarone. Pursuant to Dr. Klonis's direction, Nelson ingested 400 mg of Amiodarone per day for the treatment of his ventricular arrhythmia. Nelson had been taking Amiodarone for nearly four months when he began to lose his eyesight.

On July 9, 1996, Nelson visited Dr. Kelly Grosdidier, M.D., an optometrist, complaining of vision problems in his right eye. Dr. Grosdidier's examinations showed diffuse visual field loss for the right eye and a normal left eye visual field. Examination also revealed a right afferent pupillary defect. Nelson's right optic nerve was slightly swollen and elevated with flame shaped hemorrhaging superior to the disc. Dr. Grosdidier reported that Nelson's left eye looked normal. Three days later, Nelson visited Dr. Lawrence Hamtil, M.D., an ophthalmologist, with increased problems in both eyes. Nelson reported that he could not see anything at all with the right eye. Dr. Hamtil's funduscopic examination revealed an elevated right optic disc with splinter hemorrhages, scattered background diabetic retinopathy, and macular edema. He also noted the unchanged amblyopia in Nelson's left eye. Dr. Hamtil diagnosed Nelson's problem in the right eye as anterior ischemic optic neuropathy ("AION") associated with diabetes mellitus. By the end of July 1996, Nelson could only see light out of the corner of his right eye. The sight from his left eye, having always been poor due to amblyopia, had worsened: he could only see some color and movement with his left eye. Dr. Hamtil continued to monitor the status of Nelson's ocular problems. He noted no improvement in Nelson's eyesight and continued blood clots in both eyes. Nelson mentioned to Dr. Hamtil that his grandfather had been blind. Dr. Hamtil persisted

in his diagnosis of AION as late as June 1997.

Nelson continued taking Amiodarone for treatment of his ventricular arrhythmia until April 1997. In March 1997, Defendants changed the warnings on Cordarone's package insert to indicate that some instances of "optic neuropathy and/or optic neuritis, usually resulting in visual impairment, have been reported in patients treated with Amiodarone." In April, Defendants sent a form letter to hundreds of thousands of health care professionals explaining that "[t]here have been published reports of optic neuritis and optic neuropathy coincident with Amiodarone therapy . . . [and] we have received spontaneous reports of optic neuritis or optic neuropathy coincident with Cordarone therapy." Dr. Klonis received Defendants' form letter, phoned them, and received in response a personal letter further explaining the reports of visual impairment. Defendants sent with their letter a list of references to medical publications reporting Amiodarone therapy coincident with ocular side effects.

Meanwhile, sometime in late March or early April 1997, Dr. Hamtil learned from an *Audio Digest* article that optic neuropathy had been associated with Amiodarone ingestion. He requested further information from the National Registry of Drug-Induced Ocular Side Effects. Upon receiving that information, he informed Dr. Klonis of the reported association between Amiodarone and optic neuropathy. Dr. Klonis took Nelson off the Cordarone on April 11, 1997. Nelson's vision has not improved.

### III.  THE NELSONS' CASE ON CAUSATION

#### A.  Causation Evidence Required

■ To succeed on their products liability and negligence claims, the Nelsons must establish that ingestion of Cordarone more likely than not caused Rodger Nelson to lose his eyesight. To meet this burden in some jurisdictions, a plaintiff might be required to present evidence to "eliminate other causes that may fairly arise from the evidence." *Kaplon v. Howmedica, Inc.*, 83 F.3d 263, 267 (8th Cir.1996) (applying Arkansas law) (internal quotation omitted). In Missouri, however, the Supreme Court has held that a plaintiff is not required "to exclude every causative factor, save that for which the defendant is liable." *Kircher v. Purina Mills, Inc.*, 775 S.W.2d 115, 117 (Mo.1989) (en banc). *See also Tenbarge v. Ames Taping Tool Systems, Inc.*, 128 F.3d 656, 658–659 (8th Cir.1997) (quoting *Kircher*). Thus, a plaintiff is not required to "prove an absolutely positive causal connection." *Id.* Instead, a submissible case on " 'causation is made where the evidence is susceptible to a reasonable inference that injuries' to plaintiff resulted from defendant's product." *Ray v. Upjohn Co.*, 851 S.W.2d 646, 654 (Mo.Ct.App.1993) (quoting *Kircher*, 775 S.W.2d at 117). "Such evidence establishes that the injury or damage is not merely the result of several equally probable causes." 775 S.W.2d at 117.

The Nelsons' brief in opposition to Defendants' summary judgment motion focuses less on actual causation and more on Defendants' knowledge about the occurrences of vision loss coincident with ingestion of Amiodarone. Indeed, the Nelsons' brief includes a rhetorical argument that equates causation with Defendants' decision to report the association between Amiodarone and vision loss in March 1997:

> If the articles [cited by Defendants in their correspondence] were not authoritative regarding the issue of causation, why would [Defendants] send the additional warning information to 300,000–350,000 health care providers nationwide? The short answer is [Defendants] believed these articles to be authoritative or the letter would not have been sent and the March 1997 label change would not have been made.

*See* Plaintiffs' Brief in Opposition at 19. The Nelsons' reliance on Defendants' warning information reveals their fundamental misunderstanding about the nature of the evidence required to prove causation

in the scientific community and a court of law. The requisite proof for causation must go beyond that which is required by the Food and Drug Administration ("FDA") for reporting adverse drug effects or re-labeling to warn of the potential for adverse drug effects. *See e.g.* 21 C.F.R. § 201.57(e). The FDA requires such reporting and re-labeling regardless of whether a causal connection has been proved. *Id.* ("The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with the drug: *a causal relationship need not have been proved.*") (emphasis added). As the Court will discuss more fully in its analysis of the Nelsons' expert evidence, information that Defendants are required to report without regard to proof of causation cannot be cited later as an admission of causation.

Clearly, evidence relating to Defendants' knowledge and actions are generally relevant to the Nelson's lawsuit. For example, Defendants' knowledge about the association between Amiodarone and optic neuropathy, and their attempt (or failure) to inform others of that association, are relevant to whether Defendants had a duty to warn and breached that duty in Nelson's case. Causation, however, is an independent element of any products liability or negligence claim. Accordingly, the Nelsons can only succeed on their claims through submission of legally sufficient evidence, independent of Defendants' warning information, that would permit a jury to find that Rodger Nelson's ingestion of Cordarone more likely than not caused him to suffer optic neuropathy that resulted in loss of his eyesight.

## B. The Nelson's Expert Causation Evidence

In this case, the Nelsons' only causation evidence consists of the opinions of six medical experts. According to Defendants, none of the experts retained by the Nelsons base their opinions on reliable scientific knowledge and their testimonies will not assist the trier of fact in specifically determining what caused Nelson's

blindness. The Nelsons argue that their experts' opinions are admissible and sufficient to establish the causation element of their prima facie case. To settle this dispute under Federal Rules of Evidence 104(a) and 702, the Court finds it necessary to review the reports and deposition testimony of the Nelsons' experts. The following paragraphs summarize the qualifications, methodology, and opinions of the Nelsons' six causation experts:

### 1. Christopher T. Rhodes, Ph.D.

Dr. Christopher T. Rhodes, Ph.D. is a professor of Applied Pharmaceutical Sciences at the University of Rhode Island and the President of PharmaCon, Inc., a company that provides consulting services to government and industry on the formulation, analysis, and evaluation of pharmaceutical products. He received his Bachelors' degree in Pharmacology and Ph.D. from the Chelsea School of Pharmacy, University of London. Dr. Rhodes has published over two hundred papers on a variety of pharmaceutical topics, only one of which discussed reports of Amiodarone therapy coincident with optic neuropathy and concluded that Amiodarone causes optic neuropathy. *See Investigation of Relatively Rare Adverse Drug Events As Exemplified By A Study Of Amiodarone-Induced Optic Neuropathy*, CLIN. RESEARCH AND REG. AFFAIRS, 15(1), 1 (Marcel Dekker, Inc. ed., 1998). Dr. Rhodes' Amiodarone article arose in connection with his expert testimony in similar litigation against Defendants. *See Axen v. American Home Products*, 158 Or.App. 292, 974 P.2d 224 (1999), *modified on r'hrg*, 160 Or.App. 19, 981 P.2d 340 (affirming jury verdict in favor of plaintiff who suffered loss of visual acuity after ingesting Amiodarone).

At his deposition in this case, Dr. Rhodes testified to his general belief that there is a high degree of probability that Amiodarone ingestion causes optic neuropathy. He arrived at this opinion primarily through derivative analytical work: he

reviewed adverse drug reaction reports for Amiodarone as well as literature published in scientific and medical journals. Dr. Rhodes gives eight reasons for his opinion that Amiodarone probably causes optic neuropathy. First, he cites to the opinions of clinicians and medical scientists who have published papers in peer reviewed publications concluding that Amiodarone causes optic neuropathy. Second, he notes that other forms of neurotoxicity occur in Amiodarone patients. Third, he notes the temporal relationship between Amiodarone ingestion and occurrences of optic neuropathy, including the fact that, in many cases, Amiodarone patients who suffered from ophthalmic problems showed a partial or complete resolution of their status when use of Amiodarone was discontinued. Fourth, he points to one histopathological study that showed formulation of lamellar inclusions in the optic nerve of a single Amiodarone patient whose eye was removed. Fifth, Dr. Rhodes cites data indicating that the incidence of ophthalmic problems in Amiodarone patients is greater than in persons not using the drug. Sixth, he cites data from animal and cell culture studies that indicate Amiodarone can cause nerve damage. Seventh, he notes the occurrence of ophthalmic problems in patients being treated with other cationic amphilic drugs and the possible contribution of Amiodarone's metabolic structure to optic nerve damage. Eighth and finally, Dr. Rhodes points out that Defendants have not refuted the hypothesis that Amiodarone can cause optic neuropathy, even while they have received and relayed reports of such adverse drug reactions and modified their warning label information.

### 2. *William F. Hoyt, M.D.*

Dr. William F. Hoyt, M.D. has been a Clinical Instructor and Professor of Neuro-ophthalmology in the Departments of Neurological Surgery, Neurology, and Ophthalmology at the University of California–San Francisco School of Medicine since 1958. He is co-author of a textbook on Clinical Neuro-ophthalmology and has given many lectures on the subject. Defense expert Alfredo Sadun, M.D. describes Dr. Hoyt as the "ultimate organizer in the field of neuro-ophthalmology at a time when it was a clinical field" and acknowledges that Dr. Hoyt "taught most of the prominent neuro-ophthalmologists in this world." In the 41 years that Dr. Hoyt has been practicing neuro-ophthalmology, he has diagnosed idiopathic AION more times than he can remember but "Amiodarone-induced optic neuropathy" only three times. He made all three diagnoses as an expert witness in litigation against Defendants. Among the hundreds of articles that he has published, Dr. Hoyt has never published any articles or hypotheses pertaining to the relationship between Amiodarone and ophthalmic problems.

Dr. Hoyt arrived at his general conclusions concerning the causal relationship between Amiodarone and optic neuropathy in much the same manner as Dr. Rhodes. Dr. Hoyt reviewed articles and letters in medical literature that reported anecdotal case studies of Amiodarone patients who were subsequently diagnosed with optic neuropathy. Dr. Hoyt took special note of one neuro-pathological study of the optic nerve of a deceased Amiodarone patient. He also reviewed an article discussing the likelihood that in both Amiodarone-induced and idiopathic optic neuropathy cases, the patients probably had a precondition which made them more susceptible to ischemic nerve damage.

Unlike Dr. Rhodes, Dr. Hoyt also developed his causation opinions through personal examinations of three Amiodarone patients with ophthalmic problems (and corresponding lawsuits). Dr. Hoyt testified in his deposition that all three patients, including Nelson, exhibited a unique "marker" that separates their cases from the many cases in which he has diagnosed idiopathic AION. The unique marker was the *absence* of arteriolar narrowing on the optic disc, an effect that Dr. Hoyt considers to be a hallmark sign of idiopathic AION, based on his own observations over

41 years. Dr. Hoyt's opinion about the importance of a lack of arteriolar narrowing to diagnose Amiodarone-induced optic neuropathy is new, unpublished, and untested. In fact, Dr. Hoyt acknowledges that it is different from his opinion in the last case in which he testified.[1] Dr. Hoyt states, however, that his opinion about the distinguishing mark of Amiodarone-induced optic neuropathy is consistent with a published hypothesis concerning the mechanism by which Amiodarone "precipitates" AION in certain individuals: that Amiodarone results in deposits of lipid substance in the optic nerve head, which may be the cause of crowding of the connective tissue and which especially endangers optic discs that are already small and flat and which lack an optic cup in the center. Dr. Hoyt acknowledges that his opinions are based on personal observation, experience and medical literature limited strictly to case reports and one pathology study. He disagrees with other published opinions concerning hallmark signs of AION and potential mechanisms of Amiodarone-induced optic neuropathy; he has no knowledge of statistical incidence rates of ophthalmic problems in Amiodarone patients.

### 3. *Lenworth N. Johnson, M.D.*

Lenworth N. Johnson, M.D. is a Clinical Professor of Ophthalmology and Neurology and the Director of Neuro–Ophthalmology Service at the University of Missouri–Columbia. He has been certified by the American Board of Ophthalmology since 1987 and has treated neuro-ophthalmological conditions since 1986. Dr. Johnson has also authored numerous articles and letters to medical journals on neuro-ophthalmic disorders, including several on nonarteritic AION. He has not written any articles pertaining to Amiodarone's association with optic neuropathy.

Dr. Johnson bases his conclusions about the cause of Nelson's loss of eyesight on his review of Nelson's medical records and on published articles pertaining to optic neuropathy associated with Amiodarone. All of the articles to which Dr. Johnson refers were anecdotal case reports. One article suggested that ischemic optic neuropathy occurred in 1—4% of patients taking Amiodarone and that 33% of those patients experienced permanent visions loss. Another article from the Mayo Clinic discussed diagnoses of optic neuropathy in thirteen Amiodarone patients. Dr. Johnson relied most on information concerning previous litigation over Amiodarone-induced optic neuropathy and Defendants' changes to their 1997 labeling.

In Dr. Johnson's review of Nelson's medical records, he considered whether Nelson's sudden visual loss could have been caused by factors other than Amiodarone. Because Nelson had a history of severe headaches beginning with a fall in 1995, Dr. Johnson considered whether temporal arteritis could have caused his vision loss.[2] Although Nelson's sedimentation rates had not been tested since 1995, Dr. Johnson cited Nelson's older sedimentation rates as evidence that he did not have temporal arteritis. Dr. Johnson also concluded that temporal arteritis was not the likely source of Nelson's vision loss because Nelson's cardiac catheterization did not show any vessel occlusion in the coronary, abdominal, or renal arteries and Nelson had not shown any manifestations of temporal arteritis in the three years after his vision loss. Dr. Johnson also considered the possibility that Nelson had

1. It is worth noting that Dr. Hoyt's trial testimony in the previous case set forth a number of criteria for isolating Amiodarone-induced optic neuropathy that would not have applied to diagnose Nelson.

2. Dorland's Medical Dictionary defines temporal arteritis as a chronic vascular disease of unknown origin that occurs most often in the carotid arterial system but also in other large and small systemic arteries. It is characterized by proliferative inflammation, often with a markedly increased erythrocyte sedimentation rate. Ocular involvement, ranging from diplopia to complete blindness, may occur. DORLAND'S MEDICAL DICTIONARY 130 (28th ed.1994).

suffered from an embolic AION. He concluded from his review of a letter written by Nelson's treating cardiologist that Nelson had not had any episodes of ventricullar tachycardia significant enough to have caused his vision loss. Finally, Dr. Johnson noted that Nelson was at risk for idiopathic nonarteritic AION due to his long-standing hypertension, diabetes mellitus, and small optic nerve cup-disc ratio. He opined that Nelson's optic neuropathy was probably not idiopathic but rather Amiodarone-induced because it occurred four months after Nelson began taking Amiodarone.

### 4. Jerry B. Wurster, M.D.

Dr. Jerry B. Wurster, M.D. has been in private ophthalmological practice for over thirty years and has been certified by the American Board of Ophthalmology since 1971. He currently serves as a Clinical Professor and Director for the Departments of Ophthalmology at the University of Kansas Medical Center and the University of Missouri–Kansas City. Dr. Wurster examined Nelson twice in 1999, first on March 9th and again on September 14th. He noted that Nelson's vision had not improved, and that disc photos show only marked pallor of both optic nerve heads with no narrowing of the vessels on or around the optic nerve head.

After reviewing treatment notes from Nelson's other physicians, and medical literature sent to him by the Nelsons' attorneys, Dr. Wurster opined that Nelson's bilateral optic atrophy was caused by Amiodarone-induced optic neuropathy. The medical literature that Dr. Wurster reviewed consisted only of adverse drug experience reports for Amiodarone, articles and letters regarding anecdotal case reports of optic neuropathy coincident with Amiodarone therapy, and one letter written by Dr. Lenworth Johnson, M.D. concerning arteritic and nonarteritic AION. Dr. Wurster did not conduct his own literature search or perform any studies concerning Amiodarone's association with optic neuropathy.

### 5. Demosthenis Klonis, D.O.

Dr. Demo Klonis, D.O. has been Nelson's treating cardiologist since March 1996. He is licensed in seven states and certified by the American Academy of Osteopathic Internists in Cardiology. Dr. Klonis has participated in two efficacy studies involving Amiodarone: a double-blind, placebo controlled trial and a randomized, double-blind comparison of intravenous Amiodarone and Bretylium treatment. Neither efficacy study focused on the potential side effects of Amiodarone.

Through two long and reluctant depositions, Dr. Klonis shared his medical opinions with, and apparent hostility toward, Defendants' attorneys. When Dr. Klonis was asked if he had an opinion as to whether Amiodarone causes optic neuritis, neuropathy, and/or blindness, he answered: "It is the opinion of your company that it causes optic neuritis, optic neuropathy, and blindness. It is referenced in your articles which I received from your company and it is my clinical impression based on that information that Amiodarone causes neuritis, neuropathy and blindness." *See* Klonis Depo. at 143, Plaintiffs' Exhibit JJ. When he was pressed further for the basis of his opinion, Dr. Klonis responded:

> Based on your drug company's letter to me, the reference that they asked me to review, plus your drug company's "Dear Health Care Professional" letter which is only sent when there is a real problem. Otherwise, it is not sent. Of course, it is required by the FDA, otherwise we would never see it.

*See* Klonis Depo. at 144. Dr. Klonis appears to be particularly attached to a 1987 Mayo Clinic Report, which indicated that the incidence of optic neuropathy in the Amiodarone treated population was significantly higher than that found in the general population. He cites no other medical studies or literature to support his opinion.

#### 6. Lawrence W. Hamtil, M.D.

Dr. Lawrence W. Hamtil, M.D. has been Nelson's treating ophthalmologist since July 1996. He received his medical degree from the University of Missouri in 1961, has been certified by the American Board of Ophthalmology since 1970, and has been treating patients for ophthalmic disorders and diseases, including optic neuropathy, for over thirty years. He has only diagnosed one case of Amiodarone-induced optic neuropathy: Rodger Nelson.

Dr. Hamtil testified at his deposition that he believes, to a reasonable degree of medical certainty, that Amiodarone caused Nelson to suffer optic neuropathy and blindness. When Dr. Hamtil was asked when he arrived at his opinion that Amiodarone is capable of causing optic neuropathy and blindness, he answered:

> I guess when I got this letter from Wyeth–Ayerst Laboratories that fundamentally nailed the point—when I received a letter from Wyeth Laboratories over Mark Deitch, M.D.'s signature, indicating a causal relationship could be established between use of this medication and optic neuropathy.

*See* Hamtil Depo. at 100–101, Plaintiffs' Exhibit Y. Dr. Hamtil further testified that his knowledge about the causal relationship between Amiodarone and optic neuropathy came through a March 1997 *Audio Digest* article, the Canadian and American package inserts for Amiodarone, and Defendants' "Dear Health Care Professional Letter." *See* Hamtil Depo. at 99.

#### C. The Literature Upon Which the Nelsons' Experts Base Their Opinions

As indicated in the above descriptions, the Nelsons' experts are all highly qualified professionals in their respective fields. None of them, however, purport to be independent experts on the association between Amiodarone and optic neuropathy. Most of the Nelsons' experts acknowledge their primary reliance on medical publications, as well as adverse drug reaction reports, to reach their causation opinions. Drs. Hamtil and Klonis admit that their causation opinions are primarily based on

the fact that Defendants sent correspondence to health care professionals and changed their package insert information in 1997 to report Amiodarone's association with optic neuropathy. Even Drs. Hamtil and Klonis, however, cite some scholarly publications as a foundation for their opinions that Amiodarone caused Nelson's blindness. Accordingly, the Court finds it necessary to review the publications on which most of the Nelsons' causation experts relied in performing their derivative analyses.

#### 1. Laurel A. Feiner et al., Optic Neuropathy and Amiodarone Therapy, MAYO CLIN. PROC. 62:702–717 (1987).

In the 1987 article, *Optic Neuropathy and Amiodarone Therapy,* five contributing physicians described the medical histories of thirteen patients in whom optic neuropathy developed during treatment with Amiodarone. Laurel A. Feiner et al., *Optic Neuropathy and Amiodarone Therapy,* MAYO CLIN. PROC. 62:702–717 (1987). The authors noted some differences between the appearance and severity of classic AION and the optic neuropathy that occurred in their patients treated with Amiodarone. They indicated that the optic neuropathy manifested by their "Amiodarone-treated patients was milder than the classic examples ... and more closely resembled the nonarteritic type of the disease." *Id.* at 715. The authors also compared the incidence of seemingly inexplicable optic neuropathy in 447 Mayo Clinic patients who were treated with Amiodarone—a total of eight cases or 1.79%—with the 0.03% incidence rate of optic neuropathy in an age matched, untreated population in Olmsted County, Minnesota. *Id.* at 713. The authors noted that the difference between these two incidence rates was statistically significant, but they also admitted that their comparison failed to eliminate numerous confounding variables, including the important fact that all of the Amiodarone-treated patients had a debilitating vascular disease underlying their Amiodarone therapy. *Id.* at 713, 716–17.

Ultimately, the authors only recommended careful observation and discontinuation of Amiodarone therapy in future patients who develop optic neuropathy. *Id.* at 717. They did not suggest, even in language indicating probabilities, a causal relationship. Although the authors state that in two patients they studied, "Amiodarone seems to be a *plausible* cause of the neuropathy," *id.* at 716 (emphasis added), they explicitly acknowledge that "whether [the higher incidence rate of optic neuropathy in Amiodarone-treated patients is] due solely to Amiodarone therapy, to the underlying poor health of these patients, or to a combination of these two factors is uncertain." *Id.* at 702.

### 2. John W. Gittinger, Jr., M.D. & George K. Asdourian, M.D., Papillopathy Caused by Amiodarone, 105 ARCH. OPHTHALMOLOGY 349 (March 1987).

In their 1987 article, *Papillopathy Caused by Amiodarone*, Drs. Gittinger and Asdourian describe two patients who developed optic neuropathy while they were receiving Amiodarone hydrochloride for cardiac arrhythmias. John W. Gittinger, Jr., M.D. & George K. Asdourian, M.D., *Papillopathy Caused by Amiodarone*, 105 ARCH. OPHTHALMOLOGY 349 (March 1987). Neither of the patients lost their visual acuity. Only one of the patients was effected by optic neuropathy in both eyes, and visual field changes were present in only one of the three eyes that were effected. This led the authors to conclude that the optic swelling and hemorrhaging that they observed was not due to ischemic optic neuropathy. The authors proposed that optic disc changes of the type they observed, when coincident with Amiodarone therapy, be termed "Amiodarone papillopathy." Aside from the differences they observed, Drs. Gittinger and Asdourian based their opinion on the structural similarities between Amiodarone and other cationic amphiphilic drugs, which are known to be potential causes of verticullate corneal epithelial changes, optic atrophy, papilledema, and other neurotoxic reactions.

### 3. Sarkis M. Nazarian, M.D. & Walter M. Jay, M.D, Bilateral Optic Neuropathy Associated with Amiodarone Therapy, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(1) 25–28 (1988).

In *Bilateral Optic Neuropathy Associated with Amiodarone Therapy*, Drs. Nazarian and Jay presented the case report of a single patient who developed bilateral optic neuropathy within four weeks of beginning Amiodarone therapy. Sarkis M. Nazarian, M.D. & Walter M. Jay, M.D, *Bilateral Optic Neuropathy Associated with Amiodarone Therapy*, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(1) 25–28 (1988). The authors carefully described the symptoms of their patient. He was a 56–year–old male who had been hypertensive for twelve years prior to his Amiodarone therapy. He initially presented with normal visual acuity in the right eye and almost none in the left. Examination showed bilateral corneal epithelial deposits and bilateral optic disc swelling, though more pronounced in the left eye. Although Amiodarone was discontinued because of possible toxic optic neuropathy, his visual acuity continued to decline in both eyes. Four months later, the patient had bilateral optic atrophy with severe segmental arteriolar narrowing and sheathing.

Although Drs. Nazarian and Jay suggested that the "temporal sequence implicates Amiodarone as a possible causative agent," they also acknowledged the possibility that their patient had bilateral nonarteritic ischemic optic neuropathy unrelated to his Amiodarone therapy—particularly because of his long-standing hypertension. The authors discussed the similarity between their patient's symptoms and those generally associated with naturally occurring bilateral ischemic optic neuropathy: initial onset of vision loss in one eye with asymptomatic optic disc

edema in the other, followed by second-eye involvement days to months later. Despite these similarities, Drs. Nazarian and Jay went further in suggesting that the metabolic structure of Amiodarone is consistent with theories about pathological causation. They noted Amiodarone's cationic amphiphilic properties, which allow Amiodarone and similar drugs to penetrate lysosomes and bind to polar lipids, resulting in lamellated inclusions. In addition, they noted that those similar cationic amphiphilic drugs have also been associated with ocular changes such as papilledema and asymptomatic disc swelling. Finally, the authors noted that the peripheral neuropathy seen with Amiodarone is a toxic axonal neuropathy. They suggest that all of these factors make it "possible that Amiodarone may cause optic nerve damage." *Id.* at 27.

### 4. Samuel N. Garrett, M.D. et al., Amiodarone Optic Neuropathy, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(2) 105–110 (1988).

The authors of *Amiodarone Optic Neuropathy* describe the bilateral optic disc swelling that occurred in a 51–year–old male patient who had other, more typical signs of ocular and systemic Amiodarone toxicity. Samuel N. Garrett, M.D. et al., *Amiodarone Optic Neuropathy*, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(2) 105–110 (1988). Two months after beginning Amiodarone therapy, the patient developed tremor, gait ataxia, and had gradually decreasing vision in both eyes. Eye examinations revealed typical verticullate keratopathy in the corneas and marked swelling of both optic nerve heads. The physicians diagnosed Amiodarone toxicity. Further examinations showed no peripheral neuropathy but positive findings of keratopathy, optic disc swelling with flame hemorrhaging and cotton wool spots in both eyes. The authors ruled out AION, whether naturally occurring or secondary to Amiodarone therapy, because their patients' symptoms were atypical of that disease. The onset of his ocular problems was slow rather than sudden and simultaneous in both eyes, rather than beginning first in one eye. The patient's visual acuity was only mildly effected and, sixteen months after discontinuation of Amiodarone, the patient's visual acuity fully returned. The authors hypothesized that "once Amiodarone reaches the prelaminar optic nerve through the border tissue of Elschnig, inclusions would likely accumulate in glial cells and produce swelling of the cells and secondary axonal compression leading to blockage of axoplasmic flow." *Id.* at 108. The authors further suggested that disc swelling could persist even after discontinuation of Amiodarone because of the long half-life of the drug. *Id.* They concluded that the "cause of Amiodarone-related disc swelling is unknown," but that optic nerve pathology should be considered in patients who experience decreased vision coincident with Amiodarone therapy. *Id.* at 110.

### 5. Ahmad M. Mansour, M.D. et al., Optic Nerve Ultrastructure Following Amiodarone Therapy, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(4) 231–237 (1988).

In *Optic Nerve Ultrastructure Following Amiodarone Therapy*, three physicians presented their histopathological findings after removing the eyeball of a patient taking Amiodarone. Ahmad M. Mansour, M.D. et al., *Optic Nerve Ultrastructure Following Amiodarone Therapy*, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(4) 231–237 (1988). The patient's right eye was removed because of a melanoma. Other than this major problem, he was asymptomatic and did not report any optic neuropathy coincident with his Amiodarone therapy. Upon removal of the patient's eye, the doctors/authors found selective accumulation of intracytoplasmic lamellar inclusions in the large axons. They noted the similarity between this finding and the corneal epithelial deposits that are typical of Amiodarone keratopathy. The authors inferred that a "likely mechanism of optic nerve damage in Amiodarone-related optic neuropathy is a primary lipidosis." The authors also indicat-

ed the inconclusive results of past case studies reporting optic disc swelling coincident with Amiodarone therapy: "[t]hese 17 case reports may represent a mixture of [AION] on one side and optic neuropathy related to Amiodarone on the other side." *Id.* at 236. They conclude that their "case raises the possibility of a common, subclinical, chronic type of mild axonal degeneration secondary to Amiodarone-induced lipidosis, in contrast to the acute and less common form of neuropathy detailed in the literature. This acute form could be related to a neurotoxic effect of the drug." *Id.*

### 6. *Damien C. Macaluso, M.D. et al., Features of Amiodarone–Induced Optic Neuropathy,* AMERICAN JOURNAL OF OPHTHALMOLOGY 610–612 *(May 1999).*[3]

Drs. Macaluso, Shults, and Fraunfelder reviewed data from 73 patients who were reported to have developed an optic neuropathy while taking Amiodarone and suggested some features of what they call "Amiodarone-induced optic neuropathy." Damien C. Macaluso, M.D. et al., *Features of Amiodarone–Induced Optic Neuropathy,* 127 AMERICAN JOURNAL OF OPHTHALMOLOGY 610 (May 1999). The authors noted that incidence rates could not be accurately compared because the exact incidence of optic neuropathy in patients receiving Amiodarone is unknown, as is the true incidence of optic neuropathy in an untreated age-matched population with cardiac dysrhythmia. *Id.* at 611. The authors also noted that their incomplete data made firm differentiation between nonarteritic AION and Amiodarone-induced optic neuropathy difficult. In two photographs, the authors revealed the similarities between nonarteritic AION and Amiodarone-induced optic neuropathy. Despite these similarities and the incompleteness of their data, the authors suggested some recog-

nizable differences. They characterized Amiodarone-induced optic neuropathy as having an insidious onset, slow progression, bilateral visual loss usually occurring simultaneously, and protracted disc swelling that tends to stabilize within several months. They contrasted these features with the typical characteristics of nonarteritic AION: rapid and acute unilateral visual loss that is usually complete at onset or within a few days or weeks and resolution of disk swelling within weeks. *Id.* The authors recommended caution and regular eye examinations for Amiodarone patients, but acknowledged that "[c]urrent data are insufficient to recommend specific guidelines." *Id.* at 612.

## IV.  DISCUSSION

### A. The Nelsons' Application of Collateral Estoppel

The Nelsons argue at the outset that Defendants should be collaterally estopped from asserting that the Nelsons' causation evidence is inadmissible. The Nelsons claim that Defendants previously litigated this same issue and lost in *Axen v. American Home Products,* 158 Or.App. 292, 974 P.2d 224 (1999), *modified on r'hrg,* 160 Or.App. 19, 981 P.2d 340. In *Axen,* the Oregon Court of Appeals affirmed a jury verdict in favor of a plaintiff who suffered loss of visual acuity after ingesting Amiodarone.

■ Under the doctrine of collateral estoppel, a judgment on the merits in a prior suit may preclude a party to that suit from relitigating issues that were actually litigated and necessary to the outcome of the first action. *See e.g. Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 327 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *U.S. v. Gurley,* 43 F.3d 1188, 1198 (8th Cir.1994); *Aetna Cas. and Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 711 (8th Cir.1992).[4] In *Parklane Hosiery Co.,*

---

3.  While this article was published after Nelson's optic neuropathy occurred, it remains relevant as a possible basis for the Nelsons' experts' causation opinions.

4.  The Court notes that because the question to be decided is the admissibility of the Nelsons' expert evidence under the Federal Rules of Evidence, federal law governs the question of whether Defendants may be precluded from

*Inc. v. Shore,* the United States Supreme Court indicated that the doctrine of collateral estoppel may in some cases be used offensively by a plaintiff to preclude a defendant from relitigating issues that it fully and fairly, but unsuccessfully, litigated in a previous lawsuit brought by another plaintiff. *Parklane Hosiery Co.,* 439 U.S. at 331, 99 S.Ct. at 651. *See also Aetna Cas. and Sur. Co.,* 968 F.2d at 711. However, the *Parklane Hosiery* Court's opinion contained a few cautionary principles pertaining to the general application of collateral estoppel and to its offensive application in particular. *Parklane Hosiery Co.,* 439 U.S. at 330–31, 99 S.Ct. at 650–51; *Aetna Cas. and Sur. Co.,* 968 F.2d at 711. First, the Court cautioned that collateral estoppel can only be applied against parties who had a "full and fair opportunity to litigate" the issue in a prior suit. 439 U.S. at 328, 99 S.Ct. at 650. Second, the Court cautioned against offensive use of collateral estoppel because of its potential to encourage plaintiffs "to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Id.* at 330, 99 S.Ct. at 650. Third, the Court noted that offensive use of collateral estoppel could be unfair to the defendant in cases where the first action involved small or nominal damages and the defendant had little incentive to vigorously defend an issue. *Id.* Finally, the Court observed that subsequent actions might afford the defendant procedural opportunities that were unavailable in the first action and that could readily cause a different result. *Id.* at 330–31, 99 S.Ct. at 650.

■ Although there is no evidence that the Nelsons intentionally waited to bring their lawsuit until after *Axen* was decided, other factors exist that make this the type of case where it would be unfair to apply collateral estoppel against Defendants. First, there is no evidence in the record that the parties in *Axen* actually litigated

the admissibility of the plaintiff's expert causation evidence. Moreover, there is no indication that the trial judge in *Axen* would have decided the admissibility issue under the same standards that govern admissibility of evidence in federal court. Oregon state courts determine the admissibility of expert evidence under the Oregon Evidence Code and principles set forth in *State v. Brown,* 297 Or. 404, 687 P.2d 751 (1984). These principles are somewhat different than the standards for admissibility in federal court. *See e.g. State v. Lyons,* 324 Or. 256, 924 P.2d 802, 804 n. 1 (1996). Finally, not all of the causation experts presented in this case testified in *Axen.* Their causation opinions might be different and might even be based on different methodology. Accordingly, Defendants did not have a full and fair opportunity to litigate the exact same issues under the exact same legal standards. Such circumstances do not justify application of collateral estoppel.

## B. Admissibility of Expert Evidence

■ The admissibility of evidence is governed generally by Federal Rule of Evidence 104(a), which provides that:

> [p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 104(a). Where the proffered evidence is expert scientific testimony, admissibility is governed by Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Wood v. Minnesota Mining & Mfg. Co.,* 112 F.3d 306, 309 (8th Cir.1997); *Sorensen*

litigating the issue. *See e.g. Jaramillo v. Burkhart,* 999 F.2d 1241, 1245 (8th Cir.1993) (noting that federal law governs the preclusive

effect of a claim arising under federal law); *Poe v. John Deere Co.,* 695 F.2d 1103, 1105 (8th Cir.1982).

*v. Shaklee Corp.,* 31 F.3d 638, 645–51 (8th Cir.1994). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. As interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* Rule 702 requires the district court to ensure that expert evidence based on scientific, technical, or other specialized knowledge is "not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2786. For both elements, relevance and reliability, the district court's focus "must be solely on principles and methodology, not on the conclusions" of the expert. *Id.* at 595, 113 S.Ct. at 2797. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue." *Id.* at 592–93, 113 S.Ct. at 2796.

■ To determine whether proffered testimony is based on reliable scientific knowledge, district courts may evaluate such factors as: (1) whether the underlying scientific theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has an acceptable known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. *Id.* at 593–94, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. To determine whether proffered expert evidence is relevant, courts must examine whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591, 113 S.Ct. at 2786. Ultimately, the district court's inquiry must be a flexible one. *Id.* at 594–95, 113 S.Ct. at 2797. The court should make fact-specific determinations guided by overarching indicia of relevance and reliability. *Id.*

Typically, motions pertaining to the admissibility of expert evidence are submitted during or immediately before trial. In such cases, the district court generally has an insufficient evidentiary basis on which to make its determination and must hold a *Daubert* hearing outside the presence of the jury. A hearing is not always necessary, however, to determine the admissibility of expert evidence under *Daubert* and Rule 702. *See e.g. U.S. v. Waters,* 194 F.3d 926, 936 (8th Cir.1999) (holding that district court had sufficient information to exclude polygraph examination without conducting *Daubert* hearing), *rehearing and rehearing en banc denied* (Jan 04, 2000); *Tyler By and Through Tyler v. Sterling Drug, Inc.,* 19 F.Supp.2d 1239, 1240 (N.D.Okla.1998) (finding record sufficient to make *Daubert* analysis without hearing). The parties in this case have submitted an extensive evidentiary record, including the expert reports and depositions of all the Nelsons' experts and the literature underlying the experts' opinions. Counsel for the parties have filed lengthy briefs in support of their respective arguments. Accordingly, the Court finds that it can make a proper and thorough *Daubert* analysis without the need for an evidentiary hearing or oral argument. *See Waters,* 194 F.3d at 936; *Hopkins v. Dow Corning,* 33 F.3d 1116, 1123 (9th Cir.1994) (holding that district court is not required to hold formal *Daubert* hearing).

### C. Reliability of the Nelsons' Causation Evidence

■ The Court notes at the outset that in determining the reliability of a proffered expert's opinion, courts have discounted the reliability of experts who formed their opinions only within the context of litigation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) *(Daubert II)* ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."); *Metabolife Intern., Inc. v. Wor-*

*nick,* 72 F.Supp.2d 1160, 1168–69 (S.D.Cal. 1999) (holding expert evidence unreliable and inadmissible after noting that all experts except one formed their opinions after having been hired as expert witnesses); *National Bank of Commerce (of El Dorado, Ark.) v. Dow Chemical Co.,* 965 F.Supp. 1490, 1516–17 (E.D.Ark.1996) (finding expert unreliable after noting that her testimony was tainted by "litigation animus"), *aff'd,* 133 F.3d 1132 (8th Cir. 1998); *Muzzey v. Kerr–McGee Chemical Corp.,* 921 F.Supp. 511, 519 (N.D.Ill.1996) (holding expert methodology unreliable after noting that the expert witnesses "developed their opinions expressly for purposes of testifying."). Such considerations recognize that a scientific expert's "normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert II,* 43 F.3d at 1317. The Ninth Circuit Court of Appeals, in *Daubert II,* recognized that an expert's testimony

> based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support .... That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method."

43 F.3d at 1317 (footnote and citation omitted). The court further observed that if the proffered expert testimony is not based on independent research, the party must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles," e.g., peer review and publication. *Id.* at 1318.

While the Nelsons' experts are all highly qualified professionals in their respective fields, only two of them formed their opinions about the general causal relationship between Amiodarone and optic neuropathy outside the context of litigation. Drs. Klonis and Hamtil both formed their causation opinions in April 1997, before this case was filed. In contrast, Dr. Rhodes and Dr. Hoyt base their causation opinions on research and examinations they performed after being hired as expert witnesses in both the *Axen* litigation and in this case. Although Dr. Rhodes published an article pertaining to Amiodarone's association with optic neuropathy, he was a professional plaintiff's witness when he developed the opinions set forth in that article. *See Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 597 (9th Cir.1996) (discounting publication as factor when the opinions therein were formed by expert as paid witness for another plaintiff). Drs. Johnson and Wurster had no opinions at all on the association between Amiodarone and optic neuropathy until this case commenced and the Nelsons' attorneys contacted them. Dr. Wurster acknowledges that the only literature on which he relied for his general causation opinions came directly from the Nelsons' attorneys. Dr. Johnson's Amiodarone review was similarly limited to the context of this litigation. At the very least, these facts weaken the reliability of Drs. Rhodes, Hoyt, Johnson, and Wurster.

Dr. Klonis and Dr. Hamtil both testified in their depositions that at least part of the basis for their causation opinions were formed by Defendants' notification letter about reported ocular side effects and new package insert changes. To the extent that Drs. Klonis and Hamtil base their opinions on Defendants' 1997 package in-

sert changes and notification letters, their conclusions as to causation are not based on scientific knowledge reasonably relied on by experts in the field. Changes to drug packaging inserts and letters from drug manufacturers that report possible adverse drug reactions are required by the FDA regardless of whether a causal relationship has been established. *See e.g.* 21 C.F.R. § 201.57(e). Information that Defendants were required to provide without regard to causation cannot be used as a basis for causation. *See e.g. Lopez v. Wyeth–Ayerst Laboratories, Inc.,* 139 F.3d 905, 1998 WL 81296 at \*2 (9th Cir.1998) ("The FDA warning, therefore, cannot be relied upon as evidence of causation.").

Moreover, Defendants' labeling changes and notification letters merely relayed information about a possible association between their drug and optic neuropathy. Spontaneous reporting by a pharmaceutical company should be encouraged; it serves "as a signaling system for adverse drug reactions that may not have been detected during pre-market testing." *Haggerty v. Upjohn Co.,* 950 F.Supp. 1160, 1164 (S.D.Fla.1996). Such reporting does not, however, indicate causation. *Id. See also Adverse Drug Reaction Monitoring,* 314 NEW ENG. J. MED. 1589, 1591 (1996) ("Despite their usefulness, one or even many reports of adverse reactions often do not provide sufficient information to confirm that a drug caused the reaction. A reaction may be caused by the suspect drug, another drug that a patient is taking, or the underlying diseases for which the drug was prescribed; it may also be entirely coincidental."). Evidence of an association may be sufficient for formulation of a hypothesis that can later be tested and confirmed, but it is not proof of causation in the courtroom or the scientific community.

In this respect, it is important to note that the literature on which the Nelsons' experts rely consists solely of anecdotal case reports. While such case reports may be relevant to the question of whether Defendants had notice of the possible ocular side effects of Cordarone, they are not,

without more, reliable evidence of causation. *See e.g. Brumbaugh v. Sandoz Pharmaceutical Corp.,* 77 F.Supp.2d 1153, 1156 (D.Mont.1999). The case reports cited by the Nelsons' experts simply inform their readers about a noted temporal association between Amiodarone and optic neuropathy and the authors' hypotheses about the methodology of causation. The reports are mere compilations of reported occurrences. The authors did not attempt to isolate and investigate the effects of alternative causative agents. The reports themselves do not contain a testable and systemic inquiry into the mechanism of causation. At most, these case reports relay a basis for scientific hypotheses; they do not demonstrate a causal link sufficient for admission to a finder of fact in court. *See e.g. Brumbaugh,* 77 F.Supp.2d at 1156; *Tyler By and Through Tyler v. Sterling Drug, Inc.,* 19 F.Supp.2d 1239, 1242 (N.D.Okla.1998); *In re Breast Implant Litigation,* 11 F.Supp.2d 1217 1227– 1228 (D.Colo.1998); *Jones v. United States,* 933 F.Supp. 894, 899 (N.D.Cal. 1996), *aff'd,* 127 F.3d 1154 (9th Cir.1997), *cert. denied,* 524 U.S. 946, 118 S.Ct. 2359, 141 L.Ed.2d 728 (1998); *Sanderson v. International Flavors,* 950 F.Supp. 981, 1000 (C.D.Cal.1996); *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1411 (D.Or.1996); *Muzzey v. Kerr–McGee Chem. Corp.,* 921 F.Supp. 511, 519 (N.D.Ill.1996); *Casey v. Ohio Medical Products,* 877 F.Supp. 1380, 1385–86 (N.D.Cal.1995); *Wade–Greaux v. Whitehall Laboratories, Inc.,* 874 F.Supp. 1441, 1481 (D.Virgin Islands 1994). Although the Nelsons argue that the case reports cited by their experts were all published and thus subject to subsequent peer review, such reports evade review because they do not advance testable scientific analysis. Moreover, the Court's review of the literature reveals no significant evolution in the scientific analysis: case reports noting a temporal association in the late 1990's are similar in form and substance to case reports from the 1980s.

The hypothetical nature of the literature and the Nelsons' experts conclusions is

further confirmed by their widely varying opinions. For example, most of the articles cited by the Nelsons' experts opined that "Amiodarone-induced optic neuropathy" is milder in form and slower in onset than idiopathic nonarteritic AION. Drs. Gittinger and Asdourian decided their patients suffered from an optic neuropathy associated with Amiodarone rather than idiopathic AION because neither of the patients lost their visual acuity and visual field changes occurred in only one of the effected eyes. John W. Gittinger, Jr., M.D. & George K. Asdourian, M.D., *Papillopathy Caused by Amiodarone*, 105 ARCH. OPHTHALMOLOGY 349 (March 1987). The authors of *Amiodarone Optic Neuropathy* decided their patient's optic neuropathy was related to his Amiodarone therapy rather than having occurred naturally because the onset was slow, his visual acuity problems were mild, and the optic neuropathy affected both eyes simultaneously. Samuel N. Garrett, M.D. et al., *Amiodarone Optic Neuropathy*, JOURNAL OF CLINICAL NEURO-OPHTHALMOLOGY 8(2) 105–110 (1988). These characteristics were confirmed by the authors of *Features of Amiodarone–Induced Optic Neuropathy* after reviewing the individual case records of 73 patients. Damien C. Macaluso, M.D. et al., *Features of Amiodarone–Induced Optic Neuropathy*, 127 AMERICAN JOURNAL OF OPHTHALMOLOGY 610 (May 1999). In contrast, Dr. Wurster and Dr. Hamtil concluded that Nelson suffered from Amiodarone-induced optic neuropathy for exactly the opposite reasons: they believed that Nelson's optic neuropathy was more acute and sudden than typical nonarteritic AION. Similarly, Dr. Hoyt dramatically altered his previous opinion that Amiodarone-associated optic neuropathy is marked by slow and simultaneous bilateral involvement of the optic nerves to now opine that it is actually marked by the absence of focal arteriolar narrowing. These wide variations of opinion about the distinguishing marks and symptoms of Amiodarone-associated optic neuropathy underscores the fact that the Nelsons' expert opinions and the underlying literature support only the

formulation of various hypotheses, not a cohesive causal conclusion. "The courtroom is not be place of scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996).

In addition to their review of the anecdotal case studies, adverse drug reaction reports, and information from Defendants, some of the Nelsons' experts attempted to identify and rule out other causes of Rodger Nelson's optic neuropathy. Courts have admitted evidence obtained through such differential etiology. *See e.g. McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2nd Cir.1995); *Glaser v. Thompson Medical Company, Inc.*, 32 F.3d 969, 978 (6th Cir.1994); *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 270 n. 6 (3rd Cir. 1991); *Parsons v. Heckler*, 739 F.2d 1334, 1337 n. 5 (8th Cir.1984). To be admissible under *Daubert*, however, the differential diagnostic process of considering and eliminating other possible causes of a disease must still be based on sufficiently reliable methodology.

Dr. Hoyt testifies that he noticed Nelson had a unique "marker"—the absence of arteriolar narrowing on the optic disc—that made his optic neuropathy different than one of the hallmark signs of idiopathic AION. There are several serious problems with the methodology underlying this opinion. First, Dr. Hoyt examined Nelson on August 11, 1999, more than three years after the onset of Nelson's optic neuropathy. Second, Dr. Hoyt's assertions about the absence of arteriolar narrowing are contrary to the contemporaneous assertions of Nelson's treating ophthalmologist. Dr. Hamtil noted on both September 13 and October 18, 1996 that Nelson's arterioles were "very narrow." Third, Dr. Hoyt's opinion about arteriolar narrowing being a hallmark of idiopathic AION lacks support from other studies or literature. In fact, Dr. Hoyt cited and disagreed with an article noting that proximal constriction occurred in only 68% of the eyes affected

by nonarteritic AION. Fourth and finally, Dr. Hoyt's opinion about the signs of optic neuropathy associated with Amiodarone changed dramatically between this case and the last Amiodarone case in which Dr. Hoyt testified as an expert witness. Such circumstances militate against admission of Dr. Hoyt's opinions.

Dr. Johnson engaged in a more pure form of differential etiology. He considered such diseases as temporal arteritis, embolic AION, and idiopathic AION. Dr. Johnson's diagnostic process did not include a personal examination of Nelson. Although recurring headaches from a fall in 1995 suggested that Nelson's ophthalmic problems might have been caused by temporal arteritis, Dr. Johnson ruled out this disease as a cause of Nelson's ocular problems because of normal sedimentation rates that predated his 1995 fall. Dr. Johnson also summarily ruled out idiopathic AION despite noting that Nelson had classical risk factors for idiopathic AION: hypertension, diabetes mellitus, and a small optic nerve cup-disc ratio. The only reason he gave for this differential determination was the temporal proximity between Nelson's Amiodarone therapy and the onset of his optic neuropathy.

This type of *post hoc propter hoc* reasoning is the exact type of "scientific analysis" of which courts must be aware. "Ultimately, the theory devolves into the thesis that because 'B' came after 'A,' 'A' caused 'B.' While this may be phenomenologically and temporally accurate, it does not prove causation." *Willert v. Ortho Pharm. Corp.*, 995 F.Supp. 979, 981–82 (D.Minn. 1998). Thus, "[i]nstead of reasoning from known facts to reach a conclusion, the expert [reasons] from an end result in order to hypothesize what needed to be known but what was not." *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994). Discounting this unscientific method, courts have held that a differential diagnosis based solely on the assumption of causation due to a temporal relationship is inadmissible. *See e.g. Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 278 (5th Cir.1998) ("In the absence of an estab-

lished scientific connection between exposure and illness, ... the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation."), *cert. denied*, —— U.S. ——, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999); *Porter v. Whitehall Labs., Inc.* 9 F.3d 607, 611 (7th Cir.1993). In cases where differential diagnoses and assumptions based on a temporal relationship were admitted, there were more compelling circumstances for the experts' assumptions. For example, in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir.1999), the physician expert testified that plaintiff's sinus disease began shortly after he began working as a gasket cutter, improved when the physician experimented with keeping him from work, and worsened when the plaintiff returned to work. *Id.* at 264. The Court held that this strong temporal association was sufficiently compelling to support the physician's opinion that talc cause the plaintiff's sinus problems. *Id. See also Cavallo v. Star Enter.*, 892 F.Supp. 756, 774 (E.D.Va.1995) (noting that "if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened.)", *aff'd in relevant part*, 100 F.3d 1150, 1159 (4th Cir.1996), *cert. denied*, 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998). Contrary to the facts in *Westberry*, Nelson's ophthalmic problems continued long after his Amiodarone therapy was discontinued. Dr. Hamtil noted that Nelson's eyesight was getting worse as late as September 4, 1998, a year and a half after he stopped ingesting Amiodarone. *See* Plaintiffs' Brief in Opposition, Exhibit Z, Medical Records of Dr. Hamtil dated 9/04/98. With no other basis for ruling out idiopathic AION, Dr. Johnson's differential diagnosis does not constitute reliable scientific knowledge. *See Wheat v. Sofamor*, 46 F.Supp.2d 1351, 1359 (N.D.Ga.1999) (expert's failure to follow standard procedures for differential etiology rendered resulting opinion inadmissible).

Several of the Nelsons' experts testified that their opinions were consistent with the literature that relayed information about the metabolic structure of Amiodarone and other known effects of drugs similar to Amiodarone. For example, most of the literature relied upon by the Nelson's experts states generally accepted information that Amiodarone is a cationic amphiphilic drug that, like other drugs with adjacent hydrophilic and hydrophobic moieties on the same molecule, produces epithelial deposits in the cornea. The literature also notes that other amphiphilic drugs have been associated with retinal toxic reactions, optic atrophy, papilledema, and optic neuropathy. Like the authors on whose works they partially rely, the Nelsons' experts use this information to infer that Amiodarone must cause optic neuropathy through the same type of lipidosis that has been noticed in the other amphiphilic drugs. Similar inconclusive inferences were drawn from the pathology study. The eyeball that was the subject of that study was taken from an Amiodarone patient who had no signs of AION or other forms of optic neuropathy. The authors hypothesized that because lamellated inclusion bodies were found in the large axons, Amiodarone-induced lipidosis could possibly result in a common, subclinical, chronic type of mild axonal degeneration. They also suggested that the more acute optic neuropathy that had been reported in Amiodarone patients might be related through an unknown neurotoxic effect. The problem with these extrapolations is that they depend on numerous logical shortcuts and inferential leaps. *See Gross v. King David Bistro*, 2000 WL 151140 at *3 (D.Md. Feb.1, 2000) (to be reported at 83 F.Supp.2d 597).[5] Without testing, epidemiological study, or controlled experimentation, these theories constitute no more than scientific speculation and cannot be admitted as reliable scientific knowledge.

In summary, none of the Nelsons' experts' opinions have been tested or subjected to peer review. All the experts except for Nelson's treating physicians developed their opinions exclusively for purposes of litigation. None of the Nelsons' experts conducted any independent research of their own outside the context of litigation. Their opinions are based primarily on anecdotal case studies, adverse drug reaction reports, and Defendants' own warnings—information that the scientific community regards as not reasonably reliable for an opinion on causation. The differential diagnostic analyses that some the Nelsons' experts performed were tainted by unreliable assumptions on the temporal association between Nelson's Amiodarone therapy and his ophthalmic problems, as well as by assumptions about the significance of untested markers and symptoms of optic neuropathy. Despite the fact that an association between Amiodarone and optic neuropathy has been reported in published case studies for over ten years, these individual case reports have not evolved analytically or been subjected to peer review and controlled experimentation. Similarly, there is little to suggest that a causal connection or differentiation has been generally accepted by the medical and scientific community. Because the Nelsons' experts opinions were primarily derived from their review of case studies, their scientific methodology has no known, acceptable rate of error. In fact, the literature on which the experts base their opinions suggests that numerous confounding variables prevent an accurate distinction between optic neuropathy that might be associated with Amiodarone and naturally occurring optic neuropathy. Accordingly, such opinions and distinctions

---

5. Even if these structural and pathological analyses constitute reliable scientific evidence for the purposes of discussing drug properties and resulting ocular pathology, they are rendered irrelevant by their failure to relate sufficiently to the question at hand: whether Amiodarone causes optic neuropathy. "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796.

are no more than untested hypotheses; they are not causal conclusions and cannot be admitted into evidence.

## V. CONCLUSION

The Court finds as a matter of law that the Nelsons' experts' opinions are not based on scientifically valid principles, and thus, do not meet the reliability requirements of Federal Rule of Evidence 702 as interpreted by the Supreme Court in *Daubert.* The Court need nor address whether those experts' opinions are relevant under the second prong of the *Daubert* analysis. The testimony of the Nelsons' experts is not admissible on the issue of causation. Without this testimony, the Nelsons cannot establish a genuine issue of material fact as to causation. Therefore, Defendants are entitled to summary judgment. Defendants American Home Products Corporation and Wyeth–Ayerst Laboratories Company's Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.